RESOLUCIÓN
Se ordena la consolidación de los casos de epígrafe por tratarse todos de la misma controversia. Por las razones que exponemos a continuación, proveemos “no ha lugar” en esta etapa de los procedimientos a las peticiones de certificación que presentaron las partes peticionarias.
HH
Los hechos de cada caso se exponen por separado para facilitar su comprensión.

CT-2013-0005

En este caso tenemos ante nuestra consideración una demanda presentada por María del Carmen Alvarado Pacheco, y otros 67 empleados de la Oficina del Contralor de Puerto Rico (los peticionarios). Estos impugnan la constitucionalidad de la Ley Núm. 3-2013 por menoscabar su relación contractual con el Gobierno y tener una aplicación arbitraria e irrazonable al alterar los beneficios de retiro que tenían la expectativa de recibir.
Los peticionarios presentaron su demanda ante el Tribunal de Primera Instancia el 8 de mayo de 2013, a raíz de la aprobación de la Ley Núm. 3-2013. Al mismo tiempo, solicitaron un interdicto preliminar y permanente. En su comparecencia, solicitaron la declaración de inconstitucionalidad de las disposiciones de esa ley que menoscaban las relaciones contractuales del Gobierno con los empleados. Específicamente, hacen referencia al interés propietario y *596 los derechos adquiridos al amparo de la Ley de Sistema de Retiro, Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 LPRA see. 761 et seq., vigente al momento en que ingresaron al servicio público. El caso se encuentra pendiente aún ante el Tribunal de Primera Instancia, en etapas preliminares.
El 16 de mayo de 2013, los peticionarios presentaron una petición de certificación ante nos. El Departamento de Estado certificó que el 15 de mayo de 2013 se aprobó la Ley Núm. 18-2013, con la intención de reducir el campo de acción del Tribunal Supremo. A esos efectos, enmendó el Art. 3.002 de la Ley de la Judicatura, Ley Núm. 201-2003, 4 LPRA sec. 24s, y la Regla 52.2 de Procedimiento Civil, 32 LPRA Ap. V, entre otras cosas. En lo pertinente, las enmiendas establecen que este Tribunal solo podrá traer ante sí por recurso de certificación casos que estén pendientes ante el Tribunal de Apelaciones, salvo acuerdo entre las partes para certificarlo desde el Tribunal de Primera Instancia. Además, limitó el certiorari interlocutorio a ciertas instancias específicamente enumeradas en el estatuto.
Así las cosas, la Procuradora General y la Administración de Sistemas de Retiro, aquí recurridas, solicitaron la desestimación de la petición de certificación, por falta de jurisdicción. Los peticionarios se opusieron a la desestimación el 28 de mayo de 2013. Cuestionan la fecha real de la aprobación de la Ley Núm. 18-2013 y su aplicación a este caso. Además, las partes presentaron varios escritos en fechas posteriores replicando los argumentos de cada una.
Como parte de sus cuestionamientos, presentan como evidencia información impresa de la página cibernética de la Oficina de Servicios Legislativos (OSL) que muestra que para el 16 de mayo de 2013, a las 11:03 de la mañana, no constaba que la ley que pretendía enmendar el trámite de los recursos de certificación hubiera recibido la firma del Gobernador. La Petición de Certificación de los peticionarios se presentó en esa fecha horas antes, a las 8:44 de la mañana.
*597 El 17 de mayo de 2013 a las 3:40 de la tarde, un día después de que se presentó la Petición de Certificación, la OSL informó que la Ley Núm. 18-2013 que firmó el Gobernador el día 15 de mayo se tituló “Para declarar el día 16 de mayo de cada año como el Día de la concientización sobre la condición de angioedema hereditario”. Al mismo tiempo se reflejó en la página de internet de la OSL a las 3:30 de la tarde, la Ley Núm. 18-2013 que enmienda el trámite de los recursos de certificación. En esa ocasión, se informó que el Gobernador la firmó dos días antes, el 15 de mayo. Así pues, para el 17 de mayo de 2013, la página cibernética de la OSL reflejó dos Leyes Núm. 18-2013. Posteriormente, la otra Ley Núm. 18, titulada “Para declarar el día 16 de mayo de cada año como el Día de la concientización sobre la condición de angioedema hereditario” se renumeró como la Ley Núm. 19-2013.
Ante esta situación, los peticionarios reclaman que no se les aplique la ley que enmendó el procedimiento para que el Tribunal Supremo atienda las peticiones de certificación de los casos que se encuentren ante el Tribunal de Primera Instancia. Aducen que la ley no estaba vigente el 16 de mayo de 2013, cuando presentaron este recurso. El mismo día en que se opusieron a la desestimación, el 28 de mayo de 2013, los peticionarios presentaron ante nos una Moción Solicitando Trámite Acelerado de la Petición de Certificación.
Según las alegaciones de la demanda en este caso, los peticionarios son 68 empleados de la Oficina del Contralor de Puerto Rico que entraron al servicio público hace más de 23 años. Alegan que cuentan con entre 44 y 57 años de edad y que entraron al servicio público cobijados por el sistema de pensión de mérito, que concedía beneficios definidos y pensiones que se calculaban a base de años de servicio y de edad. Acorde con la Ley Núm. 447, los peticionarios tenían la expectativa de retirarse con una pensión del 75% del salario promedio devengado durante los 36 meses de su mayor compensación, una vez cumplieran los 30 años de servicio y, al menos, 55 años de edad; o con el 65% *598 de su salario promedio si se retiraran con menos de 55 años de edad. Al momento de la presentación de la demanda, ninguno de los peticionarios cumplía con el requisito de 30 años de servicio y 55 años de edad, necesarios para retirarse con una pensión del 75% de su salario, según las alegaciones de la demanda.
Con la aprobación de la Ley Núm. 3-2013, los peticionarios plantean que se enfrentan a un panorama de retiro totalmente distinto al que planificaron. Señalan que las enmiendas que introdujo el nuevo estatuto eliminan la pensión por mérito, para introducir un programa híbrido de contribuciones definidas, y aumentan a 61 años la edad mínima para el retiro. Así, alegan que se les ha colocado en la disyuntiva de retirarse antes de que entre en vigencia la nueva ley en aras de no perder beneficios, o quedarse trabajando entre 1.6 y 17 años adicionales a lo que originalmente proyectaron para retirarse, pero con una pensión mucho menor a la que tenían planificada. Según el desglose que presentan en la demanda, la pensión que recibirían al amparo de la nueva ley podría ser de un mínimo de 30% hasta un máximo de 65% del salario promedio.
En lás alegaciones se enumera a cada uno de los demandantes, con el detalle del impacto que cada uno reclama tener a consecuencia de los cambios en el plan de retiro. Se especifica la pensión con la que aspiraban a retirarse y la edad a la que pensaban hacerlo. Al mismo tiempo, calcularon el porciento de reducción en la pensión que esperaban recibir antes de la ley, y después de la aprobación de la Ley Núm. 3-2013.

CT-2013-0006

El 20 de mayo de 2013 se presentó una solicitud de sentencia declaratoria en que se impugnó la constitucionalidad de la Ley Núm. 3-2013 y una petición de interdicto provisional y permanente contra el Estado Libre Asociado de Puerto Rico (ELA), la Administración de los Sistemas de Retiro de los Empleados del Gobierno y de la Judicatura del ELA de Puerto Rico y el Sr. Héctor Mayol Kauffman, en *599 su capacidad oficial como Administrador del Sistema de Retiro. La demanda la presentaron 390 empleados de la Oficina de la Administración de Tribunales (OAT) que laboran en las regiones judiciales del Tribunal de Primera Instancia, en el Tribunal de Apelaciones, en este Tribunal y en la oficina central de la OAT. Se incluyen además, como demandantes, 68 empleados de la Corporación del Fondo del Seguro del Estado y otros 88 empleados del Departamento de Justicia, Departamento de Hacienda, Departamento de la Familia, Departamento del Trabajo, Administración para el Sustento de Menores, Departamento de Estado, Comisión Estatal de Elecciones, Administración de Desperdicios Sólidos y otras. El 29 de mayo de 2013 los peticionarios presentaron la primera demanda enmendada. Reclaman que por consecuencia de la Ley Núm. 3-2013 tienen que tomar una decisión inmediata con relación a su jubilación y la pensión por la que contrataron hace más de dos décadas.
Los peticionarios solicitan que se decrete la inconstitucionalidad de la citada ley en su aplicación, en la medida que les priva de derechos adquiridos y menoscaba las relaciones contractuales entre los demandantes y la parte demandada. También requieren que mediante sentencia declaratoria se decrete que el articulado referente a los servidores públicos de alto riesgo es inconstitucional por violar la cláusula de la igual protección de las leyes pues se discrimina contra todos los alguaciles demandantes injustificadamente. Asimismo, reclaman que se emita una orden de injunction preliminar y permanente prohibiendo la implantación de la Ley Núm. 3-2013 con relación a los demandantes; que se emita una orden de injunction preliminar y permanente para proteger los derechos de los demandantes que han sido obligados en muchos casos a presentar sus cartas de renuncia en o antes del 30 de junio de 2013; que se condene a la parte demandada al pago de costas, gastos y honorarios de abogados, y se conceda cualquier otro remedio que en derecho proceda.
*600 El 30 de mayo de 2013 el caso se consolidó en el foro de instancia con otros dos casos sobre el mismo asunto: María del Carmen Alvarado Pacheco v. E.L.A., (KPE2013-2799) CT-2013-5 y Víctor Trinidad Hernández v. E.L.A., (KPE2013-3050). En vista de que diversas dependencias del Estado han fijado como fecha real para la tramitación de las solicitudes de renuncia o su separación del sistema mediante retiro, la del 31 de mayo de 2013 y a su vez, por la propia inminencia de la referida ley, los demandantes acudieron el 31 de mayo de 2013 ante este Tribunal mediante una petición de certificación y de auxilio de jurisdicción al amparo de la Regla 28 de nuestro Reglamento, 4 LPRAAp. XXI-B.

CT-2013-0007

El Sr. Víctor H. Trinidad Hernández y otros presentaron el 21 de mayo de 2013 ante el Tribunal de Primera Instancia, Sala de San Juan, una petición de sentencia declaratoria e interdicto preliminar y permanente para impugnar la constitucionalidad de la Ley Núm. 3-2013. Según se alega, todos los demandantes son miembros de la Policía de Puerto Rico quienes entraron en el servicio público al amparo de la Ley 447 y la Ley Núm. 1-1990. Aducen que tienen derecho a retirarse con una anualidad equivalente a 75% de su salario promedio si cuentan con 30 años de servicio y con al menos 55 años de edad al momento de su retiro, o 65% de su salario promedio si cuentan con 30 años de servicio y menos de 55 años de edad.
Al igual que en los casos anteriores, el señor Trinidad Hernández y otros sostienen que la Ley Núm. 3-2013 representa una reducción dramática en los beneficios de re-tiro que se les prometieron. Como agravante los demandantes expresan que son servidores públicos de alto riesgo y que no pueden aportar al Seguro Social, por lo que no recibirán pensión alguna por ese concepto cuando se retiren. Luego de varios incidentes procesales acaecidos en el Tribunal de Primera Instancia y ante la inminencia de la entrada en vigor de la Ley Núm. 3-2013, supra, el señor *601 Trinidad Hernández y otros presentaron el 5 de junio de 2013 una petición de certificación ante este Tribunal. El 7 de jimio de 2013 los peticionarios presentaron una Moción Urgente Solicitando Trámite Acelerado de la Petición de Certificación. Nos solicitan que ante el poco tiempo que falta para que entre en vigor la Ley Núm. 3-2013, actuemos con celeridad y expidamos el auto de certificación.
HH I—I
A. Previo a considerar si debemos emitir los autos de certificación en estos casos, debemos determinar si la recién aprobada Ley Núm. 18-2013 aplica a estos recursos o si esta, en cambio, resulta inconstitucional por violar la doctrina de separación de poderes. De ser válida estaríamos obligados a denegar los recursos. En cambio, si determináramos que la Ley Núm. 18-2013 no aplica o es inconstitucional, debemos resolver si expedimos los autos de certificación en el ejercicio sano de nuestra discreción.
Recientemente, este Tribunal tuvo la oportunidad de profundizar en cuanto a la función de la doctrina de separación de poderes en nuestro ordenamiento constitucional. Véase A.A.R., Ex parte, 187 DPR 835 (2013). A través de nuestra historia hemos tomado la iniciativa de delimitar los contornos del poder de la Rama Judicial a la luz de esa doctrina. Ello ha sido necesario especialmente en casos en que ha sido institucionalmente necesario defender nuestro ámbito de acción ante intromisiones indebidas de otras ramas constitucionales. Véanse: Misión Ind. P.R. v. J.P., 146 DPR 64 (1998); Colón Cortés v. Pesquera, 150 DPR 724 (2000).
La doctrina de separación de poderes aspira a establecer una serie de fronteras entre las ramas constitucionales del ordenamiento jurídico. Estos límites no necesariamente son evidentes, pero sí son extremadamente poderosos y sus repercusiones permean todo nuestro ordenamiento. A.A.R., Ex parte, supra. La frontera más obvia que *602 divide el ámbito de acción entre las ramas constitucionales de gobierno es que nuestra Constitución garantizó que sería la Rama Judicial la que tendría el poder de resolver los casos y controversias que se presenten en los tribunales de Puerto Rico. Misión Ind. P.R. v. J.P., supra, pág. 112. Ante ello, hace décadas dejamos claro que “la ‘esencia’ del Poder Judicial no puede ser destruida, ‘convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar’ ”. (Enfasis nuestro). Colón Cortés v. Pesquera, supra, pág. 757, citando a Banco Popular, Liquidador v. Corte, 63 DPR 66, 76 (1944).
Ahora bien, en nuestro esquema constitucional la Asamblea Legislativa tiene un rol limitado en el ámbito de acción del poder judicial. Su rol se limita a crear y suprimir tribunales, con excepción de este Tribunal Supremo, y a determinar su competencia y organización. Const. P.R., Art. V, Sec. 2, LPRA, Tomo 1, ed. 2008. Sin embargo, esa delegación constitucional de poder también tiene límites ya que las actuaciones legislativas en ese campo solo serán válidas “en cuanto no resulte [n] incompatible [s] con esta Constitución”. (Énfasis nuestro). íd., pág. 412. Nótese que los padres fundadores quisieron limitar el poder de la Asamblea Legislativa en esta área tomando la Constitución en su totalidad, no por secciones específicas.
En defensa de estos principios constitucionales este Tribunal ha pasado juicio en cuanto a actuaciones legislativas que han afectado su jurisdicción y competencia. Específicamente, en Colón Cortés v. Pesquera, supra, establecimos que para determinar si un acto legislativo que afecta la jurisdicción de este Tribunal viola la doctrina de separación de poderes hay que analizar no solo el texto del estatuto en cuestión, sino la intención de la Asamblea Legislativa. Es decir, “[Z]o importante no es la forma del acto, sino su contenido”. (Énfasis suplido). Id. pág. 764.
Para llevar a cabo ese análisis, fuimos enfáticos en establecer que “[e]ste Tribunal no puede hacer abstracción de la verdadera intención y propósito tras determinada acción legislativa, y conformarse con sólo considerar lo que deli *603 beradamente consignan en informes rendidos por las comisiones legislativas”. Colón Cortés v. Pesquera, supra, pág. 764. Lo que es más, establecimos que
[n]o podemos pecar de una ingenuidad tal que nos haga obviar cuál es el verdadero propósito y fin de determinada actuación, cegados por lo que convenientemente se nos presenta en alegatos jurídicos como el “propósito legislativo”. No nos vamos a prestar a tal contradicción, ni al juego de palabras que a la postre no corresponde a la realidad. (Enfasis suplido). Id.
Por eso es que este Tribunal ha dejado claro que mirará con un sentido de alta sospecha cualquier actuación legislativa que se asemeje a una legislación de encargo que procure dictar el resultado de un caso en particular en el Tribunal General de Justicia de Puerto Rico o dilatar su trámite en aras de evadir una revisión judicial efectiva. En esas instancias debemos recordar que “la dama de la justicia es ciega, no ingenua”. (Énfasis suprimido). P.I.P. v. E.L.A et al., 186 DPR 1, 14 (2012).
B. En estos casos, las partes recurridas han presentado una serie de mociones de desestimación. En sustancia, en esas mociones se ha argumentado que este Tribunal carece de jurisdicción para atender estos recursos de certificación debido a la aprobación de la Ley Núm. 18-2013. Ese estatuto recién aprobado, en lo pertinente a este caso, tuvo el fin de alterar el mecanismo de certificación intrajurisdiccional según reconocido en el Art. 3.002 de la Ley 201-2003, según enmendada, conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, supra; y en la Regla 52.2 de Procedimiento Civil de Puerto Rico, supra. Por ser un asunto de umbral, dilucidamos el aspecto jurisdiccional en primer lugar. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 DPR 675, 682 (2011).
Previo a la aprobación de la Ley Núm. 18-2013 este Tribunal tenía la facultad para intervenir por iniciativa propia, “en casos pendientes ante los tribunales de inferior jerarquía cuando ‘se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que *604 incluyan cualquier cuestión constitucional sustancial’ P.I.P. v. E.L.A. et al., supra, pág. 9. Sin embargo, la Ley Núm. 18-2013 alteró este mecanismo y dispuso que, en casos pendientes ante el Tribunal de Primera Instancia, el auto de certificación solo podría ser expedido cuando medie la solicitud de ambas partes en el pleito.(1) Art. 1, Ley Núm. 18-2013. Las partes recurridas en este caso objetan que expidamos el auto de certificación. En particular, alegan que de acuerdo a la Ley Núm. 18-2013 carecemos de jurisdicción para atender la petición de certificación que presentaron los peticionarios.
Es evidente que la Ley Núm. 18-2013 representa un acto legislativo que altera la jurisdicción y competencia de este Tribunal. Para justificar la necesidad de trastocar la jurisdicción y competencia de este Foro, la Asamblea Legislativa expresó que estaba “convencida [de] que la función especial del Tribunal Supremo en la administración de la justicia en Puerto Rico es servir como órgano de revisión o de apelación y no como tribunal de primera instancia”. Ex-posición de Motivos de la Ley Núm. 18-2013, pág. 2. Por eso, “con el propósito de propiciar una adjudicación más pronta de las causas que se presentan ante su consideración”, la Asamblea Legislativa entendió que era necesario modificar el recurso de certificación intrajurisdiccional para que todo caso siga su trámite ordinario y se agoten los procedimientos apelativos antes de que el caso sea atendido por este Tribunal. íd., pág. 3. Así, la Rama Legislativa entendió que promovía “que el Tribunal Supremo pueda dedicar una mayor parte de sus esfuerzos a pautar el desarrollo del derecho puertorriqueño en consonancia con su mandato constitucional”. Id.
Sin embargo, de acuerdo con lo que decidió este Tribunal en Colón Cortés v. Pesquera, supra, para determinar la validez constitucional de este tipo de legislación hay que mirar más allá del texto estatutario y auscultar la verda *605 dera intención legislativa. En ese caso expresamos que no podemos prestamos a un “juego de palabras que a la postre no corresponde con la realidad”. Id., pág. 764. Por ello, una mirada al trámite legislativo de la Ley Núm. 18-2013 es asombrosamente reveladora.
El P. del S. 367 de la Decimoséptima Asamblea Legislativa, que posteriormente se convirtió en la Ley Núm. 18-2013, se presentó el 8 de febrero de 2013 por el Presidente del Senado, Hon. Eduardo Bhatia Gautier. El proyecto se refirió a la Comisión de lo Jurídico y el 11 de febrero fue leído en el Senado de Puerto Rico. Por un espacio de tres meses no hubo trámite en el Senado de Puerto Rico con relación al proyecto. En la primera semana de mayo de 2013 “algo” ocasionó que, como relámpagos, comenzaran nuevos trámites en cuanto al proyecto de ley.
Coetáneamente el 8 de mayo de 2013 se presentó la demanda en el caso CT-2013-5. Las partes demandadas fueron emplazadas un día después. Fue ahí cuando el Senado de Puerto Rico comenzó un trámite acelerado del P. del S. 367, que se convertiría en la Ley Núm. 18-2013.
El día después de ser emplazadas las partes demandadas en el caso CT-2013-5, se celebró una reunión ejecutiva de las Comisiones de lo Jurídico, Seguridad y Veteranos. Ese mismo día se presentó el Primer Informe de la Comisión y la medida fue remitida a la Comisión de Reglas y Calendarios. Posteriormente, el 13 de mayo de 2013 la medida apareció en el Calendario de Ordenes Especiales del Día. Ese mismo día se aprobó el proyecto en el Senado y fue remitido a la Cámara de Representantes. La noche del 14 de mayo, mientras el Pueblo dormía, ese cuerpo legislativo aprobó la medida. El día después, 15 de mayo de 2013, los presidentes de los cuerpos legislativos ya habían firmado el proyecto y lo remitieron a la Oficina del Gobernador de Puerto Rico para su firma. Es decir, luego de tres meses de inactividad, el P. del S. 367 recibió la aprobación legislativa, cuatro días después que los funcionarios estatales fueron emplazados con la demanda en el caso CT-2013-5.
*606 La trama de lo que se convirtió en la Ley Núm. 18-2013 se complica aún más con lo ocurrido en la Oficina del Gobernador. Como vimos, el P. del S. 367 aprobado por la Asamblea Legislativa llegó al despacho del Gobernador de Puerto Rico en algún momento del 15 de mayo del 2013. La contención del Estado en este caso es que el Gobernador, Hon. Alejandro García Padilla, convirtió en ley el P. del S. 367 ese mismo día.
Sin embargo, la parte peticionaria ha traído ante nuestra consideración una serie de eventos que colocan en duda cuándo en efecto advino a la vida la Ley Núm. 18-2013. Y es que el 16 de mayo de 2013 todavía no aparecía en el portal cibernético del trámite legislativo que la Ley Núm. 18-2013 hubiera sido aprobada. Tampoco aparecía como aprobada en el Sistema de Información de la Oficina de Servicios Legislativos. Para colmo, otra medida legislativa, el P. de la C. 940, fue enviada al Gobernador para su aprobación el 15 de mayo y fue firmada por este el 16 de mayo de 2013. Esa ley apareció en el portal de la Oficina de Servicios Legislativo como la Ley Núm. 18 de 16 de mayo de 2013. De hecho, por un tiempo aparecían dos leyes número 18. No es hasta el 17 de mayo de 2013 que aparece por primera vez en el portal legislativo que el P. del S. 367 en efecto se convirtió en la Ley Núm. 18-2013. La otra medida, el P. de la C. 940, pasó a ser la Ley Núm. 19-2013.
Desatar ese nudo gordiano es un misterio. Lo que sí puede tomar en consideración esta Curia es que el 16 de mayo de 2013 el Gobernador Hon. Alejandro García Padilla cursó una misiva al Juez Asociado Señor Estrella Martínez, con copia a todos los jueces y juezas de este Tribunal, en que contestó una serie de preocupaciones que el hermano Juez Asociado le había expresado en otra comunicación. En su carta —de 16 de mayo de 2013— el señor Gobernador comunicó al Juez Asociado Señor Estrella Martínez que le daría “sería consideración a sus argumentos en torno al P. del S. 367”. Es decir, el Gobernador de Puerto Rico, con su palabra escrita, dejó saber a los *607 miembros de este Foro que el 16 de mayo de 2013 todavía estaba estudiando el P. del S. 367.
No obstante, las partes recurridas se sostienen en que en efecto la Ley Núm. 18-2013 se firmó el día antes, el 15 de mayo. Así, nos encontramos ante la extraña encrucijada de dar por cierto el récord oficial del Gobierno de Puerto Rico y los escritos de las partes recurridas, que sostienen que la Ley Núm. 18-2013 se firmó el 15 de mayo, o dar por cierta la palabra del Gobernador de Puerto Rico, quien nos expresó que el 16 de mayo —cuando se presentó el recurso CT-2013-5— aún no había firmado ese estatuto, pues lo estudiaba con detenimiento.
El Art. VI, Sec. 5 de la Constitución de Puerto Rico, LPRA, Tomo 1, ed. 2008, pág. 426, establece que “[l]as leyes deberán ser promulgadas conforme al procedimiento que se prescriba por ley y contendrán sus propios términos de vigencia”. Por su parte, el Art. Ill, Sec. 19 de la Constitución de Puerto Rico, LPRA, Tomo 1, ed. 2008, pág. 399, establece:
Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.
Por otro lado, el Art. 37 del Código Político de Puerto Rico, 2 LPRA see. 182, establece que cuando el Gobernador apruebe un proyecto de ley, deberá estampar su firma, así como la fecha de su aprobación y depositarlo en la oficina del Secretario de Estado. Por su parte, el Art. 1 de la Ley Núm. 8 de 24 de julio de 1952 (2 LPRA see. 186), dispone que el Secretario de Estado promulgará las leyes estampando el sello del Estado Libre Asociado en ellas una vez sean aprobadas por el Gobernador o cuando se hayan convertido en ley conforme al Art. Ill, Sec. 19 de la Constitución de Puerto Rico, LPRA, Tomo 1.
Se desprende de lo anterior que la entrada en vigor de una ley depende de que: (1) el proyecto sea aprobado en *608 ambas cámaras por la mayoría parlamentaria y (2) el Gobernador no lo vete o devuelva en los próximos diez días. Además, su término de vigencia estará sujeto a lo que se disponga en la propia ley.
De acuerdo con lo que resolvió este Tribunal en Colón Cortés v. Pesquera, supra, pág. 764, el trámite legislativo tiene que considerarse a la hora de determinar el “verdadero propósito y fin de determinada actuación” legislativa. Es evidente que el “despertar” del trámite legislativo para aprobar la Ley Núm. 18-2013 se debió a la presentación de la demanda de epígrafe, en la que varios empleados impugnan la constitucionalidad de la Ley Núm. 3-2013. Ante la posibilidad de que los peticionarios presentaran una petición de certificación, y sumidos en un aparente pánico al prever la posible intervención de este Tribunal en este caso así como en otros casos de interés público, la Asamblea Legislativa aprobó una legislación de encargo dirigida a evitar la revisión judicial en etapas interlocutorias en estos casos pendientes ante los tribunales de Puerto Rico. Ese es el tipo de intervención legislativa que este Tribunal, con la anuencia de miembros actuales del Foro, declaró inválida en Colón Cortés v. Pesquera, supra.
Pero hay más. Al igual que en ese caso, las expresiones de ciertos legisladores juegan un papel importante en la búsqueda de la verdadera intención legislativa. Colón Cortés v. Pesquera, supra, pág. 763 esc. 9. Del Diario de Sesiones surge que durante el debate para aprobar la eventual Ley Núm. 18-2013 el Presidente del Senado y autor de la medida, Hon. Eduardo Bhatia Gautier, dejó meridianamente claros los verdaderos propósitos de esta ley. Por su pertinencia, citamos de forma extensa:
[E]se diseño de buscar la manera de llevar todo al Tribunal Supremo para tratar de interrumpir lo que es la política pública por mandato de la democracia, eso exactamente se acabó. Eso se acabó. El acceso a la justicia de la que el compañero habla es el acceso a la justicia de los que a ellos le dé la gana. Sin que haya una evidencia, sin que haya absolutamente una oportunidad de las partes a pasar prueba, que es exactamente lo que este Tribunal Supremo se está dedicando a hacer. No *609 permitir que desfile la prueba. No permitir que las partes digan qué es lo que está ocurriendo. No permitir que el país sepa lo que está ocurriendo.
Este Tribunal Supremo, lamentablemente, lamentablemente ha tomado como norte el usurpar, el usurpar el derecho de las partes de tener un juicio. Simplemente toman el caso y deciden como ellos quieren, como simplemente un grupo de [...] si son los jueces del Supremo [...] Y qué, qué [sic] coincidencia que se llevan los casos que afectan al Partido Nuevo Progresista. Se los llevan rapidito, rapidito, ésos tienen, ésos tienen “federal express” pa’l [sic] Tribunal Supremo. Eso no es justicia, eso no es justicia. Eso es destruir la justicia en este país y es lo que está pasando. Y eso se tiene que acabar ya.
[...] ¿Cuál es el miedo? ¡Ah!, yo sé cuál es el miedo. El miedo es que el juez, el juez de una sala inferior llega a unas conclusiones de derecho distintas a las del Tribunal Supremo. Ese es el miedo. El miedo es no permitir que los tribunales funcionen. El miedo es hacer y deshacer de acuerdo a la voluntad de una mayoría de personas en el Tribunal Supremo. Y eso no debe estar correcto. Eso no es correcto.
Este capítulo en este conflicto no lo empecé yo, señor Presidente. De hecho, yo le voté en contra a esta guerra. Este capítulo en esta lucha y en esta guerra la empezaron los que empezaron a sumarle números de jueces innecesariamente.
[...] Pero de ahora en adelante, de ahora en adelante, se le quita la facultad ésta al Tribunal Supremo porque han abusado, han abusado, esta facultad que se les dio y han cogido de rehén a las partes en estos conflictos que hay en Puerto Rico. Diario de Sesiones, Senado de Puerto Rico, Vol. LXI, Núm. 31, págs. 3655-3657.
Res ipsa loquitur. Por su parte, mientras se consideraba la medida en los cuerpos legislativos, los medios noticiosos reportaron que el Gobernador de Puerto Rico expresó lo siguiente:
Hay unas áreas donde ustedes saben en el pasado cuatrienio se afectó el proceder que había funcionado bien el tribunal y ustedes saben cómo trató el pasado gobierno al Tribunal Supremo, como un banquete total. Yo voy a hacer una evaluación seria y ponderada de esa medida del Presidente del Senado.(2)
*610 Estas expresiones son reveladoras, ya que demuestran que la intención de las demás ramas con la Ley Núm. 18-2013 no era realmente garantizar la eficiencia del sistema judicial en Puerto Rico y asegurar que este Tribunal se mantuviera “pautando el derecho”.
También induce a error la expresión que aparece en la Exposición de Motivos de la Ley Núm. 18-2013, pág. 2, de que en los “últimos años ha continuado la tendencia histórica de reducir la competencia de los tribunales apelativos para agilizar el trámite procesal y la resolución de los casos y controversias ante la consideración de la Rama Judicial de Puerto Rico”. Adviértase que esa expresión da a entender que existe un retraso en la resolución de controversias en este Tribunal. Sin embargo, la información empírica desmiente esa aseveración. En la actualidad, este Foro atiende recursos que apenas llegan al mes de presentados en su secretaría. Antes de que se aumentara el número de jueces de este Tribunal por petición de este Foro, según dispone la Constitución, los recursos tardaban más de seis meses en atenderse. Véase In re Solicitud Aumentar Núm. Jueces TS, 180 DPR 54, 64 (2010). Asimismo, si se analiza el Informe Estadístico del año fiscal 2011-2012 notamos que el número de casos pendientes a considerar por el Tribunal se redujo de 442 a 123 si se compara con el año fiscal 2009-2010.(3) Eso significa una reducción de más del 70 por ciento en tan solo dos años. De igual modo, el número de recursos de auto inhibitorio, mandamus y quo warranto presentados en el año fiscal 2011—2012 fue de ocho. Véase, Informe Estadístico del año fiscal 2011-2012. Sin embargo, la Asamblea Legislativa decidió “liberamos” de la carga de trabajo que supone atender esos ocho recursos en un año.
En palabras del Juez Presidente Señor Hernández Den-ton:
[...] nosotros en el Tribunal Supremo estamos bien al día, totalmente al día. El Tribunal de Apelaciones también está *611 bien al día. El proceso judicial nosotros hemos tratado de garantizarlo a través de todos estos años. Existen tres foros: Tribunal de Primera Instancia, Tribunal de Apelaciones y Tribunal Supremo [...](4)
Al igual que expresamos en Colón Cortés v. Pesquera, supra, pág. 764, no podemos cegarnos “por lo que convenientemente se nos presenta en alegatos jurídicos como el ‘propósito legislativo’ ”. Este Tribunal tiene que ir más allá. Es evidente que las expresiones que se dieron durante el proceso de aprobación de la Ley Núm. 18-2013 demuestran por un lado, un revanchismo contra las determinaciones de este Tribunal, saga de una mal llamada “guerra”, y por otro, se revela una aspiración de dilatar y, eventualmente dejar sin un remedio efectivo en una etapa importante del caso, a los empleados gubernamentales que impugnan la constitucionalidad de la nueva Ley de Retiro.
A esta conclusión también llegó un exmiembro de esta Curia, al expresar que
[l]a aprobación festinada de la Ley 18 (sin vistas públicas), unida a la total ausencia de datos estadísticos y análisis empírico que justifiquen los cambios, aparenta ser un revanchismo político-partidista en respuesta al aumento en la composición del Tribunal Supremo y a varias de sus decisiones [...]
Por ser el Tribunal Supremo el foro judicial de última instancia, la facultad legislativa de alterar y fijar su competencia no es irrestricta. Tiene que ejercerse prudencialmente y con armonía con la Constitución y, por ende, según los principios del debido proceso de ley y sus elementos cardinales de justicia accesible, rápida y económica. La Legislatura parece haber olvidado que nunca “podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo”. (Diario, Asamblea Constituyente, 592). A. Negrón García, El acceso al Tribunal Supremo, El Nuevo Día, 31 de mayo de 2013, pág. 57.
El distinguido ex Juez Asociado Señor Negrón García tiene razón. La Ley Núm. 18-2013 representa una intromi *612 sión inconstitucional de la Rama Legislativa en el ámbito de acción de la Rama Judicial. Según los principios de Colón Cortés v. Pesquera, supra, ese estatuto es insostenible ya que su trámite de aprobación demuestra un interés específico en inmunizar al Estado de la revisión judicial de casos que impugnen la constitucionalidad de las leyes de retiro. Además, su historial demuestra una indudable misión de revancha por parte de la Asamblea Legislativa contra pasadas acciones de esta Curia. Es inconcebible que en nuestro sistema constitucional esa sea una razón válida para legislar cambios en la jurisdicción y competencia del Tribunal Supremo.
Como vimos, la Ley Núm. 18-2013 alteró la manera en que este Tribunal puede expedir autos de certificación intrajurisdiccional. El estatuto llega al extremo de que para poder hacer efectiva nuestra jurisdicción en casos de certificación provenientes del Tribunal de Primera Instancia, “ambas partes” de un pleito tienen que dar su anuencia para que el auto pueda expedirse. En un caso como el de epígrafe, la Asamblea Legislativa conjuró el escenario anómalo en que una de las partes, con tan solo negar su anuencia, tiene en sus manos el poder de determinar si existe jurisdicción del Tribunal Supremo en cuanto al auto de certificación intrajurisdiccional. Con eso controla a su antojo la jurisdicción y competencia de este Tribunal. Así, en estos casos no podríamos intervenir porque la Rama Ejecutiva no lo quiere ni lo permite. Ello es inaudito y claramente inconstitucional.
Por otro lado, el esquema de la Ley Núm. 18-2013 para atender los recursos de certificación y certiorari viola la See. 3 del Art. V de la Constitución de Puerto Rico, LPRA, Tomo 1, porque efectivamente impide que este Foro sea el tribunal de última instancia en Puerto Rico. El estatuto también limitó la jurisdicción de este Foro para emitir autos de certiorari con relación a decisiones interlocutorias del Tribunal de Apelaciones. El Art. 1 de la Ley Núm. 18-2013, supra, limita la intervención de este Tribunal a decisiones interlocutorias del foro apelativo intermedio que de *613 nieguen mociones de carácter dispositivo, que traten sobre la admisibilidad de testigos de hechos o peritos esenciales, que involucren asuntos de privilegios evidenciarios, descalificaciones de abogados, anotaciones de rebeldía o en casos de relaciones de familia. Al limitar de esta manera nuestra intervención en asuntos interlocutorios queda meridianamente clara la intención legislativa de insular al Estado de la revisión judicial en los casos específicos que hoy tenemos ante nuestra consideración, si proseguir con el litigio se hace intolerable para un número considerable de los empleados demandantes, por el transcurso del tiempo.
La Ley Núm. 18-2003 garantiza que cualquier remedio interdictal o cualquier otro asunto interlocutorio en este caso o en otro contra el Gobierno, no importa cuán meritorio y urgente sea para evitar un daño irreparable, para proteger el interés público o para evitar un fracaso de la justicia, nunca llegue a este Foro. Queda así expuesta la actuación tenebrosa del Estado que intentó remover los casos en su contra de la revisión judicial de este Tribunal. Ante la naturaleza de las reclamaciones de los demandantes-peticionarios de autos, la Ley Núm. 18-2013 pretende implosionar el camino para que estos no puedan lograr remedios importantes y urgentes que se les nieguen en los foros de jerarquía inferior. La revisión del dictamen final del Tribunal de Primera Instancia sería muy tarde para atender los posibles daños irreparables.
En un ordenamiento constitucional todo poder tiene sus límites. Aunque la Asamblea Legislativa puede por delegación constitucional alterar la competencia de este Tribunal, la manera en que lo haga no puede ir en contra de otras disposiciones constitucionales. Nuestra Carta Magna establece que el Poder Judicial se ejerce por este Tribunal Supremo y que solo este es el tribunal de última instancia en Puerto Rico. Const. P.R., Art. V, Secs. 1 y 3, LPRA, Tomo 1. Los constituyentes tenían claro el alcance de este esquema. El delegado Gutiérrez Franqui explicó este sistema de la manera siguiente:
*614 Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. Esto es lo que quiere decir que será el tribunal de última instancia. Y cuando se dice que la Asamblea Legislativa puede reorganizar y abolir tribunales, se dice en forma no incompatible con las disposiciones de esta constitución; que quiere decir que lo que haga nunca podrá privar al Tribunal Supremo de su condición de tribunal de última instancia. (Enfasis suplido). 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 592 (Ed. Conmemorativa 2003).
Dicho de otro modo por el ex Juez Presidente Señor Trías Monge:
[...] La intención [...] al disponer en la sección 2 del artículo V que la Asamblea Legislativa podría determinar la competencia de los tribunales del país en modo alguno conllevaba la facultad de privar al Tribunal Supremo de entender, a su entera discreción, en cualquier causa que le fuere presentada, se opusiere o no la parte demandada o fuese el asunto concernido de la supuesta competencia del Tribunal Supremo conforme a los estatutos vigentes. (Enfasis nuestro). J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. UPR, 1982, Vol. III, pág. 95.
En esta coyuntura hay que distinguir los conceptos jurisdicción y competencia. Hemos expresado que “[la] jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias”. S.L.G. Solá-Moreno v. Bengoa Becerra, supra, pág. 682, citando a Asoc. Punta Las Marías v. A.R.Pe., 170 DPR 253, 263 esc. 3 (2007). El Art. V, Sec. 2 de la Constitución de Puerto Rico, supra, instauró un sistema judicial unificado en lo referente a su jurisdicción. Eso significa que en Puerto Rico “cualquier parte del Sistema Judicial tiene la facultad de resolver una causa”. Vives Vázquez v. E.L.A., 142 DPR 117, 135 (1996). Véase, además, J. Trías Monge, El sistema judicial de Puerto Rico, San Juan, Ed.UPR, 1978, pág. 136.
*615 En el Informe de la Comisión de la Rama Judicial de la Convención Constituyente se recomendaba la creación de un tribunal unificado para asegurar, entre otras cosas, que se eliminaran los problemas técnicos jurisdiccionales que plagaban al sistema y dificultaban la obtención de justicia en los tribunales. (Enfasis nuestro). Cosme v. Hogar Crea, 159 DPR 1, 18 (2003), opinión de conformidad emitida por la Jueza Asociada Señora Naveira Merly, a la que se unió el Juez Asociado Señor Corrada del Río. Véase, además, 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2613 (1961).
Por su parte, la competencia es “la manera en que se organiza y canaliza el ejercicio de la jurisdicción que tiene el tribunal”. Lemar S.E. v. Vargas Rosado, 130 DPR 203, 207 (1992), citando a M.A. Velázquez Rivera, Jurisdicción y competencia de los tribunales de Puerto Rico, 48 Rev. Jur. UPR 27, 29 (1979). Véase, además, Rodríguez v. Cingular, 160 DPR 167 (2003). En esencia, las reglas de competencia establecen la tramitación ordenada de los asuntos judiciales dentro de nuestro sistema de jurisdicción unificada. Cosme v. Hogar Crea, supra, págs. 9-10.
La Constitución confiere competencia a este Foro para atender en primera instancia autos de hábeas corpus y para dilucidar en última instancia sobre todas las otras controversias judiciales. Art. V, Sec. 2 de la Constitución de Puerto Rico, supra. Véase, además, R. Hernández Colón, Práctica jurídica de Puerto Rico Rico: derecho procesal civil, 5ta ed., San Juan, Ed. Lexis Nexis de PR, 2010, See. 506, págs. 48-49.
Las enmiendas que introdujo la Ley Núm. 18-2013 trastocan inconstitucionalmente ese esquema. Como vimos, ese estatuto no nos permite certificar en esta etapa a me-nos que el Ejecutivo consienta y nos impide revisar decisiones interlocutorias que se podrían convertir en académicas antes de llegar ante la consideración de este Foro por la vía ordinaria. Para todo propósito práctico, los tribunales de jerarquía inferior serían los de última instancia en casos como este.
En otras palabras, aunque se expresa que se restringe la competencia del Tribunal Supremo, en realidad lo que se *616 hace es privarle de jurisdicción para atender ciertos asuntos. Esa privación se da por completo en el caso de muchas resoluciones interlocutorias que de no revisarse causarían un daño irreparable o atentan contra el interés público, perpetuando así un fracaso de la justicia. La privación de nuestra jurisdicción también se da cuando se coloca esta a merced del veto de otra rama de gobierno, como se hizo con el recurso de certificación proveniente del Tribunal de Primera Instancia. No permitir la certificación en ciertas circunstancias también podría hacer irreversible un daño o atentar contra el interés público, y constituiría un fracaso de la justicia. En esas circunstancias se pasó por alto que según el esquema constitucional, aunque la Asamblea Legislativa tiene la facultad de reglamentar la competencia de los tribunales, ello no puede resultar en el despojo de nuestra jurisdicción para atender, a nuestra entera discreción, cualquier causa que se nos presente. Trías Monge, Historia constitucional, op. cit., pág. 95.
A la luz de los criterios esbozados por este Tribunal es evidente que los Arts. 1 y 2 de la Ley Núm. 18-2013, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003, supra, y la Regla 52.2(d) de Procedimiento Civil, supra, resultan inconstitucionales de su faz por representar una violación de la doctrina de separación de poderes. La verdadera intención de este estatuto —expresada abiertamente por su autor y evidenciada por el trámite acelerado y atropellado para su aprobación— era maniatar a este Tribunal y evadir la revisión judicial de estos y los demás casos contra el Gobierno en etapas medulares y significativas. Ello es insostenible y no podemos avalarlo. En realidad, quien quedaría maniatado por la Ley Núm. 18-2013 es el Pueblo de Puerto Rico, al ver truncado el acceso a la justicia en una etapa significativa y decisiva del proceso legal.
No debemos olvidar que los ciudadanos acuden a este Foro “para defender, vindicar y reclamar sus derechos”. In re Solicitud Aumentar Núm. Jueces TS, supra, pág. 60. Esa tarea es de importancia trascendental en nuestro sis *617 tema democrático. Cuando se trastoca la competencia de este Tribunal, se limita de forma aguda el acceso a la justicia a que tienen derecho todos en Puerto Rico. El Juez Presidente Señor Hernández Denton afirmó recientemente que el acceso a la justicia “incluye que los ciudadanos estén enterados de sus derechos y cómo exigirlos, que tengan acceso a un experto del derecho, que los procedimientos judiciales sean económicamente accesibles, y que la justicia se imparta sin atrasos”. (Enfasis nuestro). F. Hernández Den-ton, Acceso a la justicia y el estado de derecho, 81 (Núm. 4) Rev. Jur. UPR 1129, 1132 (2012). Esa frase del Juez Presidente es muy contundente. Presume que existe un procedimiento judicial accesible.
La limitación de la competencia de este Foro de manera inconstitucional en nada abona al ideal de que todos tengan acceso a la justicia. Como último intérprete de nuestra Constitución, este Foro tiene la encomienda delicada de analizar los planteamientos constitucionales que las partes presenten. Existen situaciones apremiantes que requieren que acojamos un caso mediante el recurso extraordinario de la certificación para resolverlo. Se puede afirmar que el auto de certificación es un recurso que la ciudadanía tiene a su alcance para tener acceso a la justicia en casos de alto interés público. Por otra parte, el auto de certiorari interlocutorio permite al Tribunal atender controversias que afectan de manera irremediable a las partes y pueden incidir en el resultado final de un caso. Bien utilizado, el auto de certiorari interlocutorio provee un remedio a tiempo para evitar que un error de un foro de jerarquía inferior cause un daño irreparable. Si bien las otras ramas pueden limitar la disponibilidad del recurso de certiorari interlocutorio a este Tribunal, no pueden eliminarlo en situaciones de interés público ni en situaciones que de no atenderse en la etapa interlocutoria propiciarían un fracaso a la justicia. Eliminarlo en esas circunstancias no solo impide que se imparta justicia sino que para todo efecto legal, convierte al foro intermedio en el tribunal de última instancia en ese *618 asunto, en contra del mandato expreso de la Constitución de Puerto Rico.
En nuestro ordenamiento jurídico “existe una política judicial que fomenta el mayor acceso posible de los ciudadanos a los tribunales para que sus controversias puedan ser resueltas en los méritos”. Negrón v. Srio. de Justicia, 154 DPR 79, 93 (2001), y casos allí citados. Por eso comenta el tratadista Hiram A. Sánchez Martínez, en su libro Práctica jurídica de Puerto Rico: derecho procesal apelativo, San Juan, Lexis Nexis de Puerto Rico, 2001, See. 102, pág. 3, que existe “un principio de justicia muy arraigado en las tradiciones y conciencia del pueblo puertorriqueño —que la decisión definitiva de un asunto no esté exclusivamente en manos de una sola persona— [...]”. Por esa razón, no favorece que se elimine de forma absoluta el derecho de un litigante a acudir mediante petición de certiorari ante un tribunal de mayor jerarquía. Id. En particular, expone
[...] que la Asamblea Legislativa debería reconocerle, al menos al Tribunal Supremo, una esfera mínima de acción en la cual ejercer su función constitucional como tribunal de última instancia, aunque sea a través de recursos discrecionales. Tal interpretación sería cónsona con el propósito esencial del Derecho procesal apelativo puertorriqueño como mecanismo de “control de calidad” y disuasivp de la tentación de prevaricación entre los foros inferiores. Id., pág. 4.
Este asunto delicado se complica más si analizamos los tipos de casos que se afectan con la Ley Núm. 18-2013. Tómese por ejemplo el caso de los remedios provisionales que contienen las Reglas 56 y 57 de Procedimiento Civil, 32 LPRAAp. V, tales como: (1) embargo o prohibición de enajenar; (2) orden para hacer o desistir de hacer; (3) cancelaciones de anotaciones preventivas de embargo e, (4) injunctions preliminares entre otros. En la medida que se priva a este Tribunal de revisar determinaciones interlocutorias en las situaciones antes citadas, se da al traste con el mandato constitucional de que este Foro sea el “tribunal de última instancia en Puerto Rico”. Constitución de *619 Puerto Rico, Art. V, Sec. 3, supra. Por el contrario, la Ley Núm. 18-2013 convertiría en irrevisables ese tipo de decisiones de los foros de jerarquía inferior.
Precisamente la Ley Núm. 177-2010 enmendó la Regla 52.1 de Procedimiento Civil de 2009 (32 LPRAAp. V), con el propósito de permitir que el Tribunal de Apelaciones ex-pida recursos de certiorari para revisar asuntos interlocutorios por los fundamentos siguientes:
(a) casos que revistan interés público;
(b) situaciones en la que esperar a la apelación constituiría un fracaso irremediable a la justicia.
Esa enmienda que introdujo la Ley Núm. 177 es un reconocimiento sabio de parte de la Asamblea Legislativa de que existen situaciones imprevisibles en las que hay que brindarle una herramienta al Poder Judicial para que resuelva casos excepcionales. La Ley Núm. 18-2013 no contiene un lenguaje similar al empleado en la Ley Núm. 177-2010. De esa forma, se despoja a los litigantes de su derecho a revisar determinaciones interlocutorias cuando entiendan que son ilegales o hasta inconstitucionales.
Claro está, no debemos perder de perspectiva que el concepto “acceso a la justicia” no significa que cualquiera puede plantear cualquier cosa en un tribunal, cuando le plazca. Tiene que haber un caso y controversia justiciable. Lozada Sánchez et al. v. JCA, 184 DPR 898 (2012) (Martínez Torres, J.); Acevedo Vilá v. Meléndez, 164 DPR 875 (2005) (Hernández Denton, J.); E.L.A. v. Aguayo, 80 DPR 552, 584 (1958) (Serrano Geyls, J.). Por ello, el caso no puede ser académico ni prematuro. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 933 (2011) (Martínez Torres, J.); San Gerónimo Caribe Project v. A.R.Pe., 174 DPR 640, 652 (2008) (Hernández Denton, J.). Para que un litigante pueda instar una acción en el Tribunal General de Justicia de Puerto Rico es necesario que ostente legitimación activa. Lozada Sánchez et al. v. JCA, supra; Fund. Surfrider y otros v. A.R.Pe., 178 DPR 563 (2010) (Martínez Torres, J.); Romero Barceló v. E.L.A., 169 DPR 460, 506 (2006) (Op. disidente de Rodríguez Rodríguez, J.); Acevedo *620 Vilá v. Meléndez, supra; Hernández Torres v. Hernández Colón et al., 131 DPR 593 (1992) (Hernández Denton, J.); Hernández Torres v. Gobernador, 129 DPR 824 (1992) (Hernández Denton, J.). Para determinar si una parte tiene legitimación activa, tiene que demostrar que “[ha sufrido] un daño claro y palpable; que éste es real, inmediato y preciso, y no abstracto e hipotético; que existe conexión entre el daño sufrido y la causa de acción ejercitada; y que la causa de acción surge bajo el palio de la constitución o de una ley”. Mun. Fajardo v. Srio. Justicia et al., 187 DPR 245, 255 (2012) (Martínez Torres, J.). Véanse, además: Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 924 (2010) (Hernández Denton, J.); Col. Peritos Elec. v. A.E.E., 150 DPR 327, 331 (2000) (Hernández Denton, J.); Asoc. Maestros P.R. v. Srio. Educación, 137 DPR 528, 535 (1994) (Hernández Denton, J.).
Como expresó el Juez Presidente, el acceso a la justicia consiste “en que los procedimientos judiciales sean económicamente accesibles, y que la justicia se imparta sin atrasos”. Hernández Denton, supra, pág. 1132. Podemos añadir que el acceso a la justicia también incluye que los ciudadanos afectados tengan mecanismos procesales disponibles para hacer valer sus derechos de forma efectiva. Enunciamos sin ambages que la Ley Núm. 18-2013 en nada abona al importante principio de acceso a la justicia que pregona con vigor la Rama Judicial. Por eso nos decepciona que la Oficina de Administración de los Tribunales no se opusiera al P. del S. 367, boy Ley Núm. 18-2013, como era su deber, cuando tuvo la oportunidad de hacerlo. Véase Informe de la Comisión de lo Jurídico, Seguridad y Veteranos del Senado de Puerto Rico de 10 de mayo de 2013, págs. 2-5.
III
Por los fundamentos que anteceden, concluimos que los Arts. 1 y 2 de la Ley Núm. 18-2013, supra, en la medida en que alteran los incisos (d) y (e) del texto original del Art. *621 3.002 de la Ley de la Judicatura de 2003, supra, y la Regla 52.2(d) de Procedimiento Civil, supra, son inconstitucionales de su faz. La forma atropellada en que se aprobó el P. del S. 367 y el historial legislativo de esa medida revelan las intenciones de las Ramas Ejecutiva y Legislativa de impedir que los peticionarios acudieran ante este Tribunal mediante las peticiones de certificación que nos ocupan. También estos artículos de la Ley Núm. 18-2013 son inconstitucionales por privar a este Foro de ser el tribunal de última instancia en ciertos casos e incidentes procesales, como estos. Este Tribunal siempre ha brindado la debida deferencia a las leyes aprobadas por los representantes elegidos por el Pueblo. Véanse: AAR, Ex parte, supra, (Pabón Charneco, J.); Lozada Sánchez et al. v. JCA, supra, (Martínez Torres, J.); Delgado, Ex parte, 165 DPR 170, 192-193 (2005) (Rodríguez Rodríguez, J.); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 DPR 181, 189 (1993) (Hernández Denton, J.). Pero esa deferencia termina en la línea que la Constitución trazó.
Al concluir de esa forma, resulta innecesario dilucidar el enigma de la fecha de aprobación de la Ley Núm. 18-2013. Por lo tanto, concluimos que este Tribunal tiene jurisdicción y competencia para atender las peticiones de certificación que se nos presentan en estos casos. Veamos ahora si debemos ejercer nuestra discreción para expedir los autos solicitados en esta etapa de los procedimientos.
En el pasado, el recurso de certificación intrajurisdiccional ha sido utilizado por este Tribunal “para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención”. U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 272-273 (2010).
Tampoco debemos perder de vista que el recurso de certificación es “de carácter excepcional porque la norma preferida en nuestro ordenamiento es que los casos maduren durante el trámite ordinario para evitar así que el foro de última instancia se inmiscuya a destiempo”. U.P.R. v. Laborde Torres y otros I, supra, pág. 272. Véase, además, Ri *622 vera v. J.C.A., 164 DPR 1, 7 (2005). Asimismo, la certificación permite que este Foro dilucide algunos casos que de otra forma evadirían nuestros pronunciamientos. U.P.R. v. Laborde Torres y otros I, supra, pág. 273; Presidente de la Cámara v. Gobernador, 167 DPR 149, 160—161 (2006).
Aunque las alegaciones de las demandas en estos casos exponen daños concretos y detallados, que parecen ser suficientes de su faz, no podemos olvidar que esas alegaciones exponen hechos sobre los cuales, en ausencia de estipulación, es indispensable presentar prueba en el foro primario. Esa es la razón por la cual declaramos "no ha lugar” las peticiones de certificación, en esta etapa de los casos. Es decir, estos casos presentan cuestiones de hecho para las cuales es necesario presentar evidencia. En eso se diferencian estos casos de otros que hemos decidido.
Por ejemplo, en Domínguez Castro et al. v. E.L.A. I, 178 DPR 1 (2010), certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S. Ct. 152, la controversia medular era auscultar la constitucionalidad de la Ley Núm. 7-2009, mejor conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, 3 LPRA see. 8791 et seq., al amparo de varias cláusulas constitucionales. De esa forma, en ese caso no existían controversias de hecho que requirieran enviar el caso al foro primario para recibir prueba.
Por su parte, en Asoc. Fotoperiodistas v. Rivera Schatz, supra, la controversia que se nos presentó era analizar la justiciabilidad del caso ante la actuación del Presidente del Senado que restituyó el acceso de la prensa a las sesiones legislativas. Concluimos en ese caso que la controversia se había tornado académica porque el Presidente del Senado implantó medidas administrativas para corregir la situación. Id., pág. 948. No había controversias de hecho en ese caso que requirieran el desfile de prueba.
Finalmente, en P.I.P. v. E.L.A. et al., supra, nos tocó dilucidar la constitucionalidad de una pieza legislativa que dispuso para la celebración de un referéndum que se cele *623 bró el 19 de agosto de 2012. En ese referéndum, se le propuso al Pueblo enmendar las Secciones 2, 3, 4, y 7 del Art. Ill de la Constitución de Puerto Rico, LPRA, Tomo 1, con el fin de reducir el número de miembros de los Cuerpos Legislativos. En ese caso sostuvimos la constitucionalidad de la Resolución Concurrente del Senado Núm. 35 de 13 de abril de 2010 y la Ley Núm. 12-2012 por entender que cumplían con nuestra Constitución. Como se desprende de nuestra jurisprudencia, hemos atendido certificaciones sin el beneficio de un desfile de prueba cuando se trata de cuestiones puramente de derecho. P.I.P. v. E.L.A. et al., supra; Domínguez Castro et al. v. E.L.A. I, supra.
En los casos ante nuestra consideración es necesario presentar evidencia sobre la edad de los demandantes y los años cotizados por ellos para poder calculár cómo les afecta la Ley Núm. 3-2013. Eso nos lleva a concluir que en el ejercicio de nuestra discreción, no proceden los autos de certificación en esta etapa.
Ahora bien, los intereses públicos involucrados en estos casos son excepcionales. Los peticionarios han hecho unos planteamientos que merecen una consideración seria y pronta. Por eso enfatizamos el deber que tiene el Tribunal de Primera Instancia, Sala de San Juan, de atender las controversias planteadas por las partes demandantespeticionarias de forma diligente con toda la urgencia necesaria. La Ley Núm. 3-2013 entrará en vigor en poco menos de un mes y, de no proveerse un remedio interlocutorio oportuno, los peticionarios se verán obligados a tomar decisiones drásticas que podrían ir desde renunciar a sus empleos y acogerse a un plan de pensión menor del esperado o continuar trabajando por años y acogerse a la nueva estructura de retiro provista por esa ley. Por eso, el trámite que el foro primario debe dar a estos casos debe ser atento, expedito y deliberado. Las repercusiones de estos casos pueden afectar a los peticionarios por el resto de sus días. Ante ese escenario, la Sala de Instancia deberá asegurarse de que las partes demandantes-peticionarias tengan a su disposición cualquier remedio provisional de naturaleza in *624 terdictal o de cualquier otra índole que sea necesario para preservar sus derechos frente a la fecha límite que se avecina. Véase Art. 678 del Código de Enjuiciamiento Civil, 32 LPRA see. 3524. Como mínimo, el foro primario debe resolver ese asunto antes de que entre en vigor la Ley Núm. 3-2013, supra, el 1 de julio de 2013, pues su deber es evitar que la demora judicial deje sin remedio a una parte que lo amerite. De igual modo, el Tribunal de Primera Instancia debe atender con premura las mociones dispositivas que tiene ante sí, de manera que la parte que resulte perjudicada por su decisión pueda utilizar los mecanismos de revisión judicial que el ordenamiento legal le provee.
Como parte de ese trámite y ante la inminencia de la fecha en que entra en vigor la Ley Núm. 3-2013, es conveniente y necesario que el Tribunal de Primera Instancia celebre una vista no más tarde del 18 de junio de 2013 en la que se presente evidencia sobre la edad de los demandantes-peticionarios y los años cotizados en el servicio público, a menos que las partes logren estipular esos hechos. Recibida esa prueba y con la misma premura, el tribunal tiene el deber de realizar las determinaciones de hechos correspondientes mediante resolución a esos efectos.
No podemos terminar sin hacer una exhortación pública a proteger los derechos del Pueblo por encima de cualquier otra consideración. La única “guerra” que debemos librar en las tres ramas de Gobierno es contra la injusticia.
Siempre habrá diferencias sobre el impacto o corrección de las decisiones de este Foro. De ese concurso de ideas vive la democracia. Sin embargo, debemos estar claros en que un elemento esencial de esa democracia es que existan los mecanismos para que las personas afectadas puedan llevar sus casos y controversias justiciables a los tribunales. Esas personas no pueden ser las víctimas colaterales de una mal llamada “guerra” contra este Tribunal. Para evitar eso, este Foro exigirá para sí la misma deferencia que le otorga a las actuaciones discrecionales de las otras ramas que no violen la Constitución ni las leyes. Que no quede duda de que con el mismo fervor haremos valer la *625 Constitución y esas leyes, en protección de los derechos del Pueblo en la democracia a la que todos aspiramos.

Publíquese inmediatamente y notifíquese de inmediato a las partes y al Tribunal de Primera Instancia por teléfono, correo electrónico o fax, y posteriormente por la vía ordinaria.

Lo acordó y ordena el Tribunal, y certifica la Secretaria del Tribunal Supremo. EL Juez Asociado Señor Martínez Torres emitió un voto particular de conformidad. La Jueza Asociada Señora Pabón Charneco emitió un voto particular de conformidad. El Juez Asociado Señor Kolthoff Caraballo emitió un voto particular de conformidad. El Juez Asociado Señor Rivera García emitió un voto particular de conformidad. El Juez Asociado Señor Estrella Martínez emitió un voto particular. El Juez Presidente Señor Hernández Denton emitió un voto particular disidente, al que se unió la Jueza Asociada Señora Fiol Matta. La Jueza Asociada Señora Fiol Matta emitió un voto particular disidente. La Juez Asociada Señora Rodríguez Rodríguez emitió un voto particular disidente.
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

Voto de conformidad emitido por el
Juez Asociado Señor Martínez Torres.
La Juez Asociada Señora Rodríguez Rodríguez no solo rehusó defender la integridad de este Foro y la separación de poderes en su mal llamado voto particular disidente. (En realidad es un voto concurrente porque coincide con denegar el auto de certificación, pero por fundamentos distintos a los de la mayoría. Claro está, disidencia suena mejor para las gradas). También hace una imputación grave de falta de imparcialidad a los tres miembros de esta Curia, a saber: los Hons. Kolthoff Caraballo, Estrella Mar *626 tínez y el que suscribe, que en aras de evitar un posible choque constitucional nos reunimos con el Presidente del Senado luego de presentarse el proyecto que hoy es la Ley Núm. 18-2013.
Es necesario, entonces, aclarar el expediente frente a las tergiversaciones de la Juez Asociada. Allí nadie se reunió para discutir un caso en específico, futuro o ya presentado, mucho menos estos casos consolidados. Tres integrantes de este Tribunal, con la responsabilidad constitucional de ser miembros del cuerpo que constitucionalmente conforma el Poder Judicial, nos reunimos con el jerarca de otro poder constitucional para inquirir acerca de la razón para la presentación de un proyecto de ley dirigido a eliminarle a este Foro, en ciertos casos, la jurisdicción —es decir, la autoridad— de atender ciertos asuntos antes de que se hagan académicos, con el pretexto de reglamentar nuestra competencia. Lo mismo expresamos públicamente. Esa reunión no es inusitada. De hecho, terminada la reunión en la oficina del hermano Juez Asociado Señor Estrella Martínez, el Presidente del Senado pasó a la oficina del Señor Juez Presidente. No hay nada deshonesto en defender al Poder Judicial que regenteamos ni en intercambiar impresiones de política pública con los jerarcas de los otros poderes constitucionales. Así ocurrió, por ejemplo, cuando el Juez Presidente Señor Todd hizo sugerencias de enmienda a la Comisión de lo Judicial de la Convención Constituyente. Véase J. Trías Monge, Historia constitucional de Puerto Rico, San Juan, Ed. UPR, 1981, Vol. II, pág. 97. Como señaló el otrora Juez Presidente Señor Andréu García, cualquier legislación de reforma al sistema judicial debería contar con la participación efectiva de la Rama Judicial. Mensaje del ex Juez Presidente señor Andréu García, Autonomía Presupuestaria para la Rama Judicial, 20 de diciembre de 2002. Disponible en: http://www. ramajudicial.pr/orientacion/prensa/20-12-02.html (última visita 11 de junio de 2013). Y es que por si la Juez Asociada no se ha enterado, valga recordar que el Poder Judicial lo ejerce este Tribunal Supremo (Const. PR, Art. V, Sec. 2). *627 Véase In re Aprob. Rs. y Com. Esp. Ind., 184 DPR 575 (2012). Bastaba llamar a los jueces presentes en esas dos reuniones para que la Juez Asociada se enterara de lo que se discutió en ellas.
Por eso es lamentable que en su afán de defender al Gobierno actual la Juez Asociada eche al suelo los estándares mínimos de convivencia, respeto mutuo y deferencia que son indispensables para el funcionamiento óptimo de un cuerpo colegiado. Pero no puedo pedirle peras al olmo. Por mi parte le aseguro al Pueblo que seguiré adjudicando conforme a mi conciencia y no doy valor a los reclamos de probidad de toda aquella persona que coloque a un partido político por encima del derecho y su juramento deimparcialidad.
Voto particular de conformidad emitido por la
Jueza Asociada Señora Pabón Charneco.
De nada nos vale hablar de independencia judicial si la Legislatura de Puerto Rico puede en cualquier momento fijar la jurisdicción que el Tribunal Supremo tiene.(1)
Estoy conforme firmemente con la Resolución de epígrafe. La decisión que hoy emite este Foro representa una vindicación de la doctrina de separación de poderes al impedir un trastoque que otra rama del ordenamiento ha intentado llevar a cabo con la jurisdicción de este Tribunal de manera inconstitucional. Nuevamente nos vemos obligados a poner en vigor los contornos de “esas fronteras invisibles pero poderosas que delimitan el ámbito de acción de cada Rama del gobierno”. A.A.R., Ex parte, 187 DPR 835 (2013). Esa labor nunca es sencilla, pero es parte de lo que sostiene a nuestro ordenamiento. Y como muy bien se dis- *628 cute en la Resolución que antecede, no es la primera vez que este Tribunal se ve obligado a deslindar las fronteras de la doctrina de separación de poderes.
No obstante, en aras de atender algunos de los planteamientos contenidos en los votos disidentes que hoy se emiten, me siento obligada a emitir estas breves expresiones.
H
Hace poco este Tribunal pudo profundizar en cuanto a la doctrina de separación de poderes. A.A.R., Ex parte, supra. En esa ocasión revisitamos los fundamentos de esa doctrina y vimos cómo esta es parte intrínseca de nuestro ordenamiento constitucional, siendo vehículo para garantizar la libertad de los ciudadanos en un sistema democrático como el nuestro. Por ser más una doctrina de filosofía política que una norma legal, es entendible que existan diferencias en cuanto a cómo la Rama Judicial debe ponerla en vigor. En ocasiones, como en A.A.R., Ex parte, supra, la doctrina se sostiene al no ejercer nuestro poder constitucional, dejando así que las otras ramas ejerzan sus facultades. Sin embargo, la separación de poderes en ocasiones se defiende haciendo un ejercicio afirmativo del Poder Judicial.
Las situaciones que más evidentemente ameritan la utilización de ese poder vindicador surgen cuando las otras Ramas se inmiscuyen con la Rama Judicial en un intento de limitar el poder que la Constitución le delegó a esta. Por eso este Tribunal no ha vacilado en ejercer su poder para declarar inconstitucionales aquellas actuaciones legislativas contrarias a la doctrina de separación de poderes. Colón Cortés v. Pesquera, 150 DPR 724 (2000); Misión Ind. P.R. v. J.P., 146 DPR 64 (1998). Obviamente, la utilización de ese poder no es un ejercicio fácil y conlleva un cierto grado de tensión con las otras ramas del ordenamiento. Pero precisamente para eso existe el sistema de pesos y contrapesos inherente a la doctrina de separación de poderes. Es por ello que se presume la existencia de fun *629 cionarios valientes que defenderán los poderes de las Ra-mas que les fueron encomendadas.
En los casos que tenemos ante nuestra consideración hoy no hay duda de la verdadera intención de la Asamblea Legislativa de Puerto Rico al aprobar la Ley Núm. 18-2013. Las expresiones de su autor en el hemiciclo del Senado hablan por sí solas. El manejo en la Oficina del Gobernador ha puesto en duda la fecha en que efectivamente se firmó el estatuto. El trámite de las demandas de epígrafe demuestran el indudable interés legislativo en crear una serie de “islas jurisdiccionales” en nuestro ordenamiento para impedir que, de alguna forma u otra, los casos de autos fueran revisados efectivamente por este Tribunal. Como muy bien explica la Resolución que antecede, esa actuación rebasa las fronteras constitucionales al violar la doctrina de separación de poderes.
El que este Tribunal declare inconstitucionales las intromisiones legislativas con el poder de la Rama Judicial no es novel. Al igual que en la jurisdicción federal, la Rama Legislativa “no puede aprobar legislación que elimine un área de jurisdicción en aras de controlar el resultado en un caso en particular”. (Traducción nuestra). J.E. Nowak y R.D. Rotunda, Constitutional Law, 7ma ed., St. Paul, Ed. Thomson West, 2004, pág. 38. Y como vimos, este Tribunal ha sido valiente y ha declarado inconstitucionales anteriores actuaciones legislativas, aunque ello conllevara la paralización de importantes proyectos de infraestructura para la administración de tumo. Los casos de autos representan otro evento más en la saga de ocasiones en que este Tribunal ha tenido que defender su jurisdicción: hoy no se han pautado nuevas normas ni se han revocado precedentes.
Es por eso que hoy me hago eco de las elocuentes palabras de la Juez Asociada Señora Rodríguez Rodríguez. Hace siete (7) años —a saber, en el 2006— sentenció la compañera:
Esencial para nuestra convivencia democrática es el respeto que una rama de gobierno le debe a la otra. Respeto que se *630 traduce en el mutuo reconocimiento y resguardo de las facultades y prerrogativas de cada cual. Misión Ind. P.R. v. J.P., 146 DPR 64 (1998); Banco Popular, Liquidador v. Corte, 63 DPR 66 (1944).
Este Tribunal ha respetado siempre ese equilibrio constitucional. No hemos vacilado cuando las actuaciones de una rama irrumpen sobre las facultades intrínsecas de otra rama. Así, hemos sido enfáticos al rechazar la intromisión indebida de la Asamblea Legislativa con el ejercicio de la función judicial. (Enfasis suplido). Acevedo Vilá v. Aponte Hernández, 168 DPR 443, 491 (2006).
Sin embargo, como en toda controversia constitucional, y más en una en la cual se determina que ha habido una violación a la doctrina de separación de poderes, es normal que existan diferencias de criterio. Debemos recordar que una opinión judicial no puede probar de forma lógica que su resultado es absolutamente correcto, solo puede explicar el razonamiento del Juez individual que la suscribió. Por eso, era de esperarse algún tipo de disidencia ante la Resolución de epígrafe. No obstante, no puedo disimular mi asombro ante la inconsecuencia palpable de los que hoy disienten.
Por un lado, me decepciona profundamente el proceder del Juez Presidente Señor Hernández Denton quien ha abandonado la postura valiente que asumió en Colón Cortés v. Pesquera, supra. En ese caso defendió las facultades de este Tribunal frente a un intento legislativo de afectar un caso pendiente. Véase, además, Misión Ind. P.R. v. J.P., supra. La situación que tuvimos ante nosotros en los casos de autos fue aún más grave ya que se pretendió convertir al Tribunal de Apelaciones en el tribunal de última instancia, de modo que este Foro no pudiera revisar muchos asuntos interlocutorios, causando así un fracaso de la justicia.
Ciertamente nos encontramos ante un conflicto único en nuestra historia constitucional. Esperaba que al menos el Juez Presidente Señor Hernández Denton hubiera mantenido su valiente metodología interpretativa que le hubiera *631 permitido defender a este Foro. Es verdaderamente lamentable que, en el ocaso de su carrera en este Tribunal, el Juez Presidente se retire dándole la espalda a la Rama Judicial y permitiendo que su legado pase a la historia matizado por el hecho de que ante ataques a esta resolviera de acuerdo al color del cristal con que miró la controversia.
Por su parte, la Juez Asociada Señora Rodríguez Rodríguez se ha refugiado nuevamente en su albergue de retórica y sofismas. Vimos que la compañera también asumió posturas valientes para defender a esta Rama de ataques inconstitucionales, pero hoy claudicó a su rol y huyó a las fronteras del derrotismo. Hace poco más de un año, la Juez Asociada Señora Rodríguez Rodríguez se comprometió a defender la Constitución “con [las] uñas y con [los] dientes”. In re Aprob. Rs. y Com. Esp. Ind., 184 DPR 575, 677 (2012). Sin embargo, hoy parece que algún ente le limó las uñas y le removió sus dientes. Cabe preguntarse qué ocasionó ese cambio doctrinal en cuanto a cómo se concibe el rol de este Foro. La respuesta quizás está en algún momento luego del 2 de enero de 2013. No obstante, todavía se mantiene en su presagio de hecatombes judiciales míticas y medioevos constitucionales que la ha caracterizado desde marzo de 2009. Hoy tuvo que valerse de un “grimorio judicial” para explicar por qué en el pasado había que defender a la Rama Judicial de ataques constitucionales de otras Ramas y hoy hay que dar deferencia. Ello a pesar de que “fuentes de derecho” que la compañera cita a menudo también han cuestionado la validez de la Ley Núm. 18-2013.(2) La historia será en última instancia juez de las razones por las cuales hoy se nos revela un cambio en su metodología adjudicativa.
*632 I—I
En conclusión, reafirmo mi conformidad con la Resolución de epígrafe. El derecho aplicable a esta controversia ya se había establecido en Colón Cortés v. Pesquera, supra, y estoy obligada a seguirlo. Defender la doctrina de separación de poderes no es tarea sencilla: los roces entre las Ramas son inevitables. Pero nuestro sistema se nutre de esos eventos que marcan el desarrollo constitucional de una sociedad. Puesto que mi cargo me obliga a defender a este Tribunal Supremo, estoy conforme con la Resolución de epígrafe.
Voto particular de conformidad emitido por el
Juez Asociado Señor Kolthoff Caraballo.
Con relación a toda la situación surgida con la aprobación de la Ley Núm. 18-2013, es menester dejar consignadas unas cortas expresiones.
i—I
Durante el proceso de la aprobación de esta ley, ciertamente se intentó tender puentes de comunicación que evitaran un choque entre ramas de gobierno que ostentan igual jerarquía constitucional. Como resultado, y a contrario sensu, las ramas hermanas de gobierno aceleraron el trámite en la aprobación de la medida, ante la presentación del caso de epígrafe. Esto, sin duda, fue muy lamentable.
Como se indica correctamente en la Resolución del Tribunal, en todo este doloroso proceso no hemos sido incautos, sino más bien hemos actuado de buena fe. Sin embargo, cuando se trata de la defensa de la jurisdicción y la competencia de este Tribunal no debe confundirse la buena fe con pobreza de espíritu.
*633 El Tribunal Supremo es una institución centenaria que antecede, incluso, nuestra Ley Suprema. Por lo tanto, es imposible que los que hemos recibido la encomienda de velar por nuestra Constitución y los intereses del Pueblo en ella forjados, no defendamos incesantemente la institución que sirve de garantía a la protección de esos intereses. Los principios que enmarcan nuestra Constitución y las leyes de este País demandan, no solo acceso a los tribunales, sino acceso oportuno. Por eso, no escatimaremos en la consecución de ese fin, aun a costa de la deferencia que le debemos a las demás ramas hermanas. Y es que, como dice el dicho popular, “lo cortés no quita lo valiente”.
II
En cuanto a la causa de acción de los múltiples demandantes, de los documentos presentados por todas las partes aparenta que los empleados públicos han sufrido un claro y sustancial menoscabo permanente de las condiciones en sus anualidades futuras de retiro. Esta situación amerita una pronta consideración de este Tribunal, sobre todo ante la festinada fecha de vigencia de la ley.
Por esto es necesario que, como claramente se señala en la Resolución de esta Curia, el Tribunal de Primera Instancia celebre sin dilación alguna una vista evidenciaría, mediante la cual al menos se certifiquen las alegaciones de los peticionarios en cuanto a sus edades y los años cotizados, de manera que se pueda corroborar la anualidad que finalmente recibirán según los parámetros de la Ley Núm. 3-2013.
Como dice el lema de esta augusta Rama: “la justicia somos todos”. Hoy una parte importante de ese “todos” necesita que esa justicia se muestre eficaz, para que sea oportuna. Eso es lo que “todos” queremos.
*634 Voto particular de conformidad emitido por el
Juez Asociado Señor Rivera García.
Nuestra Constitución ha delegado en nosotros, los jueces [,] un inmenso poder. Somos los defensores de los derechos de nuestros ciudadanos, los intérpretes de la constitución y el freno a la usurpación de poder por las ramas políticas del gobierno(1)
Hoy una mayoría de este Tribunal se ve precisada a ejercer por imperativo constitucional su responsabilidad de proteger los derechos del pueblo y de nuestra Constitución. Por medio de una intromisión indebida de la Rama Legislativa y el Poder Ejecutivo se pretende cercenar el postulado de acceso a la justicia de los ciudadanos que acuden a este foro judicial en la búsqueda de esa justicia. Asimismo, se intenta privar de un remedio efectivo a los empleados públicos que impugnan la constitucionalidad de la nueva Ley de Retiro, Ley Núm. 3-2013. El Estado, en su maltrecha tesis, aduce que este Tribunal no posee jurisdicción para atender la petición de certificación de los empleados públicos fundamentándose en la recién aprobada Ley Núm. 18-2013, la cual enmendó, entre otros preceptos, el Art. 3.002 de la Ley de la Judicatura, 4 LPRA sec. 24s, y la Regla 52.2 de Procedimiento Civil, 32 LPRAAp. V.
Tras justipreciar todos los factores y circunstancias de la aprobación del referido estatuto, sin lugar a dudas, ciertas disposiciones de la Ley Núm. 18-2013 resultan inconstitucionales de su faz por transgredir la doctrina de separación de poderes que constituye uno de los cimientos del andamiaje constitucional. Nuestros pronunciamientos en *635 Colón Cortés v. Pesquera, 150 DPR 724 (2000), resuenan en nuestra conciencia judicial al enfrentamos a una intrusión de gran envergadura en las responsabilidades y funciones de este Tribunal para con el pueblo. En aquella ocasión, reconocimos que “[l]o importante al determinar si cierta actuación legislativa infringe el principio de separación de poderes, es si la intención clara y específica de la ley fue afectar el resultado de un pleito en particular”. (Enfasis suprimido). íd., pág. 764.
Como bien resalta el dictamen mayoritario, tanto el trámite legislativo como las expresiones vertidas en el hemiciclo por el Presidente del Senado, Hon. Eduardo Bhatia Gautier, y recogidas en el Diario de Sesiones, revelan diáfanamente los verdaderos propósitos de esta Ley. Esto es, que fue diseñada y engendrada por encargo para afectar el resultado de un caso en particular: el de los empleados del Gobierno de Puerto Rico ante la nueva Ley de Retiro. De esta forma, se le arrebata insidiosamente a la ciudadanía el derecho de beneficiarse de un acceso a una justicia rápida y efectiva mediante los remedios procesales en toda su extensión ante el foro de última instancia.
Es un axioma que nuestra Constitución delega en la Asamblea Legislativa el poder de crear y suprimir tribunales —con excepción del Tribunal Supremo— y a determinar su competencia y organización.(2) Empero, de igual jerarquía es la máxima de que la Asamblea Legislativa no tiene el poder constitucional para limitar la jurisdicción del Tribunal General de Justicia.(3) Así tampoco podrá afectar la competencia de forma que esa actuación legislativa incida sobre la jurisdicción constitucionalmente reconocida al Tribunal Supremo de Puerto Rico.
Cónsono con lo anterior, el profesor Felix F. Stumpf plantea que al amparo del principio de la separación de poderes, “la rama judicial tiene que proteger su independencia y autonomía rechazando las intromisiones indebi *636 das de las ramas legislativa y ejecutiva, lo cual ocurre comúnmente cuando la legislatura aprueba leyes que usurpan poderes judiciales inherentes o explícitos”. (Traducción nuestra). F.F. Stumpf, Inherent Powers of the Courts: Sword and Shield of the Judiciary, Nevada, The National Judicial College, pág. 7.
En ese sentido, la integridad del poder judicial queda intrínsecamente afianzada a la convergencia de dos elementos: la separación de poderes y la independencia judicial. Sobre este particular, conviene recordar los pronunciamientos del ex Juez Presidente Señor Andréu García en ocasión de un mensaje ante estudiantes de derecho:
La razón de ser de estas disposiciones constitucionales es el no exponer al sistema judicial, que depende enteramente de las otras ramas de gobierno para su composición y financiamiento, a las represalias, presiones y a situaciones de indebida intervención de esas ramas, en garantía de la independencia judicial. Constituiría un serio peligro para la democracia que la rama judicial se vea sujeta a cambios sustanciales, modificaciones, creaciones, eliminaciones de sus tribunales y jueces con cada cambio de Gobierno. Ello propiciaría la inestabilidad del sistema de justicia y la desconfianza en los tribunales por parte de la ciudadanía que depende de la rama judicial para asuntos vitales de su existencia: su familia, sucesión, dilucidación de pleitos, desagravios, y más importante aún, justicia por los atentados a su vida, propiedad y persona.(4)
Estos postulados han sido defendidos impetuosamente por los miembros de esta Curia, lo que significa que no es la primera vez y auguro que no será la última. De hecho, en una comparecencia ante la Asamblea Legislativa el entonces Juez Presidente Señor Andréu García bien expresó:
Nuestra ciudadanía no está debidamente informada de cómo funciona la separación de poderes, sistema en el que la Rama Judicial tiene igual rango que la Rama Ejecutiva y la Rama Legislativa, y el cual no permite la intervención indebida con *637 la independencia judicial. Sobrevive la percepción generalizada de que el poder político tiene facultad de intervención en los asuntos judiciales. (Enfasis suplido).(5)
Definitivamente, mediante las acciones de los otros dos poderes públicos, hoy se quiere debilitar la Rama Judicial al romper con el equilibrio que evita la concentración de poder. Así, la separación de poderes se quiebra ante una lucha sin sentido y sin precedentes en nuestra historia constitucional. Resulta desafortunado que para justificar su proceder, la Asamblea Legislativa invoque que el propósito de la Ley Núm. 18-2013 es “propiciar una adjudicación más pronta de las causas que se presentan ante [la] consideración”(6) de este Foro y, por lo tanto, en beneficio de las partes vinculadas al proceso judicial. Lo innegable es que tal intento desemboca en una acumulación indebida de poder y en la disminución de los poderes de otra rama, siendo esto incompatible con nuestro ordenamiento constitucional. A todas luces, quien se vería afectado en última instancia por las actuaciones inconstitucionales de los poderes políticos es el pueblo de Puerto Rico, de manera que se le priva de aquellos instrumentos procesales que le permiten dilucidar los reclamos de alto interés público de manera rápida y eficiente. Ante esos antecedentes, es preciso ponderar un pensamiento que jamás pierde vigencia: “no existe tiranía peor que la ejercida a la sombra de las leyes y con apariencias de justicia”.(7)
Asimismo, cuando juré al cargo de Juez Asociado de este Tribunal, me comprometí a
[...] dirigir mis esfuerzos y compromisos para que el poder judicial sea más accesible, equitativo, con sentido humanista y dentro del marco de la independencia judicial. Es nuestro *638 norte que una Rama Judicial investida de independencia judicial es la mejor garantía de nuestro sistema de vida democrático y de los derechos naturales de la humanidad. Claro está, sin olvidar o soslayar el principio de la separación de poderes y la deferencia a las demás Ramas Constitucionales. En esencia la separación de poderes que desde los antiguos griegos y romanos, pasando por el esquema “del Espíritu de las Leyes”, de Montesquieu, la transformación de la teoría de “El Federalista” hasta los padres de nuestra Constitución, es y será espina dorsal de nuestro sistema constitucional.(8)
Ahora bien, el olvido selectivo de algunos miembros de esta Curia en asuntos de trascendencia, y que van a la médula de la sana administración de la justicia, no deja de sorprendernos. Realmente nos deja perplejos como, con irreverente “amnesia”, los principios básicos de la doctrina de separación de poderes asegurados a través de la independencia judicial, quedan vulnerables a los ataques de actores que a todas luces actúan pérfidamente y se alejan de “proveer un equilibrio en el ejercicio del poder político que garantice, a su vez, la protección de las libertades individuales”. F. Hernández Denton, La independencia judicial en Puerto Rico, Xmo Encuentro de los Presidentes y Magistrados de los Tribunales Constitucionales y Salas Constitucionales de América Latina, Konrad Adenauer Stiftung Ed., Santiago de Chile, 2003, pág. 3.
En sintonía con mi contención, reafirmo con vehemencia que es pernicioso, y por ende reprochable, que no se mantenga una unidad de criterio cuando de intromisiones indebidas a los poderes constitucionales de nuestra rama se trata. Arriban a mi pensamiento las palabras ilustres, tal vez olvidadas hoy, cuando se proclamaba que “[e]n todo el hemisferio se reconoce la importancia del principio de independencia judicial [...] la autonomía e independencia del Poder Judicial constituyen premisas indispensables para su funcionamiento eficaz”. Hernández Denton, supra, pág. 1.
Sin embargo, ante la coyuntura histórica y las actuaciones de algunos distinguidos miembros de esta Curia, pa *639 rece ser que el concepto de independencia judicial ha sufrido una mutación: es decir, que recurramos a la indignidad del silencio y nos dejemos despojar de nuestras facultades constitucionales como último foro revisor dentro de la jurisdicción estatal. En ese contexto, luego de ánalizar el tortuoso trámite del P. del S. 367, medida aprobada sin la celebración de vistas públicas y ausente de la participación e insumo de distintos sectores de la comunidad jurídica y académica, siento el deber de invocar ciertos pronunciamientos tras la aprobación de la Ley de Reforma Judicial de 2003:
Dicho estatuto es el producto de un diálogo entre los poderes públicos del país y de un estudio abarcador de la Rama Judicial que realizó una Comisión presidida simultáneamente por el Juez Presidente y por el Secretario de Estado. A diferencia de las leyes aprobadas anteriormente que afectaron la judicatura, en esta ocasión se escuchó y se le brindó una participación directa al Poder Judicial en el proceso de legislar asuntos de trascendencia judicial.
Al firmar dicha ley, la Gobernadora reiteró que “su administración, en pleno ejercicio de su responsabilidad histórica, ha establecido una política pública clara de respeto a la independencia judicial, de puertas abiertas, y de diálogo continuo sobre las áreas de fortalecimiento y reforma del sistema judicial del país”.
En su exposición de motivos, la Ley afirma que, al aprobarla, tanto el Poder Ejecutivo como el Legislativo reconocen la importancia de la independencia judicial en nuestro ordenamiento constitucional. Señala al respecto: “En virtud de la presente Ley, se reconoce y afirma que la Rama Judicial será independiente, accesible y cumplirá sus servicios, de manera equitativa, rápida, económica, sensible y con un enfoque humanista”.
Por último, se reconoce en la referida ley que los retos del Siglo XXI requieren el fortalecimiento del sistema judicial en todas sus dimensiones. Este proceso de voluntad conjunta propicia los cambios al sistema judicial que el Pueblo de Puerto Rico necesita y merece. Debemos asegurarnos que la Rama Judicial sea autónoma y esté libre de presiones externas. Así mismo, debe haber una colaboración efectiva, diálogo genuino, entendimiento sincero y respeto en todo momento entre las tres ramas de gobierno.
*640 En fin, aunque la Constitución de Puerto Rico reconoce la importancia de un Poder Judicial independiente y establece unas medidas para garantizar su posición protagónica en nuestro ordenamiento, a través de los años los tribunales se han ganado el respeto del país y de los otros poderes. El Poder Judicial ha superado ataques de las otras ramas de gobierno y como consecuencia ha fortalecido su independencia de éstas. Actualmente es el garante máximo de los derechos humanos en Puerto Rico. En reconocimiento a estos logros los otros poderes públicos recientemente han aprobado leyes descritas anteriormente que, sin lugar a dudas, nos permiten cumplir con nuestras obligaciones con la independencia e imparcialidad que requiere nuestra democracia. Hernández Denton, supra, págs. 18-20.
Los manifiestos actos ultra vires de la Asamblea Legislativa y las declaraciones del Señor Presidente del Senado vertidas durante el debate de la pieza legislativa en controversia son concluyentes en cuanto a las motivaciones subyacentes y el claro menosprecio hacia los atributos y funciones del Tribunal Supremo. Por ello, es preciso plan-tear las interrogantes siguientes: ¿En qué quedó el discurso sobre la superación a los ataques de otras ramas y el ganarnos el respeto del país y de los otros poderes? Peor aún, al encontrarnos frente a una medida que pretende situar al ciudadano en una posición de desventaja ante las acciones del Estado, quitándole el remedio procesal de obtener un dictamen justo, final y concluyente de manera oportuna, quiero saber ¿a dónde fue a parar el ánimo de que la Rama Judicial sea independiente, accesible de manera que cumpla sus servicios de manera equitativa, rápida, económica, sensible y con un enfoque humanista?
En ese entorno, también debemos cuestionar, ¿dónde está la pasión que ferozmente distinguía a nuestra Máxima Institución Judicial como garante de los derechos humanos? Ciertamente, sería un día lúgubre si sumisamente permitiéramos esta intromisión en las prerrogativas constitucionales de esta Curia y accediéramos a la invitación que nos hace la disidencia. Esta claudicación deja al desnudo que las posturas de ciertos miembros de este Tri *641 bunal varían dependiendo de quién ostenta el poder político en un momento histórico.
Al así actuar, ignoran el principio arraigado en nuestro ordenamiento jurídico que impide que la Rama Legislativa restrinja nuestra jurisdicción apelativa al punto de que nos inhabilita cumplir con el imperativo constitucional de revisión. Este principio rector mantiene la uniformidad de los procesos y protege a la Institución de ataques políticos que tienen como norte eludir nuestro poder revisor de sus actuaciones.
Consciente de las limitaciones a los contornos del poder de legislación, los padres de la Constitución de Puerto Rico fueron explícitos cuando enunciaron lo siguiente:
Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia.
Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. (Énfasis suplido). 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 591-592 (1952) (expresiones del delegado Sr. Gutiérrez Franqui).
A estas expresiones se unen las del Juez Todd, quien profundizó sobre el tema de separación de poderes e independencia judicial al señalar que
[l]a base fundamental del sistema democrático americano [...] la independencia judicial [...] debe ser garantizad[a] en la Constitución en tal forma que nadie pueda ponerla en duda. Aun cuando debe existir la interdependencia de las tres ramas de gobierno, o sea, la ejecutiva, la legislativa y la judicial, estableciéndose lo que en nuestro sistema judicial se conoce con el nombre de checks and balances, cada una de ellas, en cier *642 tos y determinados aspectos es y debe ser independiente de las otras. Es, sin embargo, la Rama Judicial, la balanza moderadora en la cual, en última instancia, habrían de pesarse las actuaciones tanto de la rama ejecutiva como de la rama legislativa. Es en la revisión judicial de esas actuaciones que los jueces son llamados a determinar si se ha violado o no algún precepto constitucional de alguna ley. Bajo nuestro sistema de gobierno esta función judicial constituye la garantía suprema que tiene el pueblo de que sus derechos serán en todo momento preservados y reconocidos. (Enfasis suplido). 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 8 (1952), Primer Día de Sesión, 17 de septiembre de 1951 (ex-presiones del Juez Presidente del Tribunal Supremo Roberto H. Todd).
Conocido es que la independencia judicial busca “garantizarle a la sociedad que los derechos de cada uno serán evaluados en un foro libre e imparcial [...]”.(9) Basta decir que va más allá de un mero requisito constitucional, sino que “representa un alto grado de crecimiento personal, es decir, persigue un proceso decisional independiente de las preferencias personales del juez o jueza”. C.E. Ramos González, Independencia judicial, 43 Rev. Jur. UIPR 273 (2009).
En virtud de este axioma, en In re Reforma Judicial, 136 DPR 1 (1994), el ex Juez Asociado Señor Negrón García expresó mediante voto separado lo siguiente:
Ni el Poder Ejecutivo ni la Asamblea Legislativa deberían atentar así contra la independencia judicial; menos debilitar nuestros procesos democráticos. Todo lo contrario, deberían retomar conciencia de las más sanas tradiciones constitucionales y de buen gobierno olvidadas por quienes hasta hace poco detentaron esos poderes. (Énfasis suprimido). íd., pág. 43.
En aras de evitar la concentración de poderes y así asegurar la convivencia democrática entre las ramas de gobierno, la independencia judicial se hace indispensable hoy más que nunca. Esto, pues, cuando se ejerce este principio:
*643 [...] fortalece el propio sistema democrático adoptado por nuestra Constitución. Este noble principio garantiza que los jueces resuelvan los casos ante sí con total independencia de criterio, sin ceder a presiones de la política partidista o de la opinión pública. La sociedad puertorriqueña debe entender la importancia de contar con una Judicatura independiente para su propia protección. (Énfasis suplido).(10)
Y es que el Tribunal Supremo, como último foro representativo del Poder Judicial, no puede callar mientras se diseña el escenario perfecto para un ardid contra el pueblo de Puerto Rico. Ante tal afrenta a la dignidad y los derechos de nuestros ciudadanos, se hace urgente el llamado a hacer ver que la Rama Judicial tiene igual rango que la Rama Ejecutiva y la Rama Legislativa. Precisamente, hoy es un momento oportuno para que esa “percepción generalizada de que el poder político tiene facultad de intervención en los asuntos judiciales” sea desterrada.
Cónsono con lo expuesto, es imperativo retomar nuestra obligación de defender la posición constitucional del poder judicial cuando las otras dos ramas de gobierno intentan afectar un caso específico. Por esta razón, debemos rechazar enérgicamente esta insostenible intervención en los asuntos judiciales. Esto, enfatizo, no para beneficio de los Jueces de esta Curia y sí para el desarrollo de nuestra democracia.
Con fiel arraigo a los principios de una sana administración de la justicia y el acceso a ella por parte de los ciudadanos, es impostergable que cada miembro de este Tribunal siga el principio rector que presupone la independencia judicial. De forma que defienda la separación de poderes y reclame la demarcación de las responsabilidades que sabiamente delega nuestro sistema republicano de gobierno. Así pues, como magistralmente ha expresado el ex Juez Presidente: “la independencia judicial no es un privilegio de los jueces, ni siquiera se concibe la misma en beneficio de ellos. La independencia judicial es un derecho del pueblo *644 para que los jueces puedan dispensar justicia libres del temor que representaba.] [...] posibles medidas de represalia".(11)
Por último, debo puntualizar lo que, a mucho pesar, concibo como un descarnado servicio a nuestra Rama Judicial. Me refiero a la complicidad de la Oficina de Administración de los Tribunales en la consecución de la aprobación de esta Ley a través de su comparecencia por escrito durante el trámite legislativo de la misma. La referida ponencia, desnuda de fundamentos jurídicos y estadísticos, en nada enaltece la política pública del Poder Judicial que muy bien plasmó el entonces Juez Presidente Señor Andréu García al aseverar la necesidad del fortalecimiento de la independencia de nuestra rama de gobierno cuando ex-presó que
[l]a Rama Judicial debe ser la que atienda sus necesidades de sedes, de salas y de competencias, de conformidad con los cam-bios rápidos que están ocurriendo y continuarán ocurriendo en Puerto Rico. Es la Rama que cuenta con la información necesaria para hacer determinaciones de esa naturaleza, ya que está en mejor posición de conocer lo que hace falta para lograr el funcionamiento integral del sistema, incluso la carga de trabajo, la distribución de los recursos humanos, las vías de acceso y la interrelación necesaria de cada tribunal con las otras ramas de gobierno.
Cónsono con lo anterior, también les propongo nuevamente que cualquier legislación de reforma del sistema judicial se apruebe sólo si la legislación cuenta con el apoyo, la aprobación y la participación efectiva de la propia Rama Judicial. (Énfasis suplido).(12)
Lo cierto es que las actuaciones de la Directora Administrativa derrotan la política pública enunciada por la propia Rama Judicial. Es nefasto que en momentos en que el sistema judicial es víctima de infundados ataques, sea esta funcionaría la emisaria que se preste a avalar esta inaceptable transgresión del espacio reservado para el ejercicio de nuestra función constitucional.
*645 Así concluye otra estrofa de este Bolero de Ravel, que tiene como melodía la de nunca acabar. Sólo queda el “silencio ensordecedor” que arropa ciertos pasillos de esta Honorable Curia, que nunca debería negarse a defender su Constitución “con uñas y dientes”, tal y como recientemente lo expresara la distinguida compañera y Juez Asociada, Señora Rodríguez Rodríguez.(13)
Asimismo, al avalar la Ley Núm. 18-2013, pareciera que una parte de este Tribunal ya no está consciente de que este es el “foro de última instancia donde se atienden los asuntos más acuciantes que aquejan” a nuestros ciudadanos; foro que debe “ser un recinto para la discusión serena, abierta, ejemplarizante, racional, imparcial y equilibrada, y sin ataduras de clase alguna”.(14) Hoy, cuando hay que salir a la defensa de las prerrogativas de esta Curia y del bienestar de la ciudadanía, algunos ya no gritan “Qué lástima!”.(15) Sí, “[e]s obvio [...] que no basta que se proclame en una Constitución escrita el principio de separación de poderes o la autonomía del Poder judicial para que un país tenga auténticas libertades y para que sus jueces gocen de efectiva independencia”.(16) Ciertamente, se necesitan esos hombres y mujeres libres y valientes para la garantía eficaz de este principio: “indoblegables ante intereses, entidades o propósitos que resulten extraños al fin mismo de la Justicia, y que tengan capacidad de acción”.(17) Es por ello que estoy conforme con la Resolución de la mayoría de este Tribunal, pues de la demagogia y la retórica sobre la Justicia clamadas a conveniencia nunca obtendremos ese fin superior, sino solo una desnutrida y falsa percepción de este noble ideal.
*646 Consecuentemente, ante las desatinadas contradicciones de algunos miembros de este Foro y el ataque a nuestra Institución y a los derechos de nuestro pueblo, me hago eco de aquellas expresiones que denuncian que “el proceder de las tiranías es hacer que parezca razón y derecho lo que ha sido usurpación”.(18)
Voto particular emitido por el
Juez Asociado Señor Estrella Martínez.
Nos encontramos ante una controversia de alto interés público que requiere una adjudicación final y firme antes del 30 de junio, para beneficio de decenas de miles de servidores públicos. Nos hallamos ante el recurso idóneo para reafirmar con acciones la política de acceso a la justicia. Nos enfrentamos al deber de ejercer oportunamente nuestra competencia como tribunal de última instancia y facilitar la administración justa, rápida y económica de una controversia de alto impacto en la planificación financiera del gobierno y en la vida de sus servidores públicos.
Ante todos esos retos, considero que la respuesta adecuada de este Tribunal consistía en traer inmediatamente a nuestra atención el reclamo de los empleados públicos peticionarios y adjudicar la controversia, lo cual pudimos haber hecho desde el pasado mes de mayo. Curiosamente, con el curso de acción trazado por la mayoría del Tribunal, las Ramas Legislativa y Ejecutiva —aunque no de jure— logran de facto que este Tribunal no conceda un remedio adecuado y completo en el momento oportuno. Ante el medio camino recorrido por una mayoría de este Tribunal y su abstención en transitar el trayecto completo del ejercicio de nuestras facultades y deberes ministeriales impuestos por *647 la Constitución de Puerto Rico, disiento de la negativa a expedir el presente recurso.
I
Seiscientos catorce (614) empleados públicos han acudido ante este Tribunal implorando nuestra intervención oportuna en la etapa más crucial de la implantación de la Ley Núm. 3-2013. Sin embargo, una mayoría de esta Curia ha provisto "no ha lugar” en esta etapa a sus peticiones. Veamos en detalle los reclamos incoados por estos servidores públicos en tres peticiones de certificación que versan sobre el mismo asunto.
El 16 de mayo de 2013, sesenta y ocho empleados de la Oficina del Contralor de Puerto Rico (empleados públicos o peticionarios) presentaron ante nos una petición de certificación, solicitando que esta Curia intervenga con una demanda de sentencia declaratoria e interdicto preliminar y permanente presentada por ellos el 8 de mayo de 2013, ante el Tribunal de Primera Instancia.(1) En esencia, los empleados públicos piden que traigamos de inmediato ante nuestra consideración la referida demanda, en la cual solicitan que se declare inconstitucional la Ley Núm. 3-2013, la cual enmienda la Ley Núm. 447 de 15 de mayo de 1951, mejor conocida como la Ley de Sistemas de Retiro de los Empleados Públicos, por ésta presuntamente afectar los intereses propietarios, los derechos adquiridos y los beneficios de re-tiro contractualmente conferidos a los peticionarios por el Gobierno de Puerto Rico, en violación de la See. 7 del Art. II de la Constitución de Puerto Rico, LPRA, Tomo 1.
En respuesta a la petición de certificación de los empleados públicos, el 21 de mayo de 2013 el Gobierno de *648 Puerto Rico (ELA) y la Administración de los Sistemas de Retiro de los Empleados del Gobierno y de la Judicatura del Estado Libre Asociado de Puerto Rico (Administración de los Sistemas de Retiro) (colectivamente el Estado), presentaron, independientemente, una moción de desestimación al amparo de la Regla 32 del Reglamento de esta Curia, 4 LPRA Ap. XXI-B. Ambas mociones arguyen que este Tribunal no posee jurisdicción para atender el recurso de referencia. Sostienen su contención en la Ley Núm. 18-2013, la cual enmienda, en lo pertinente, el Art. 3.002 de la Ley Núm. 201-2003, mejor conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 LPRA sec. 24s, y la Regla 52.2 de Procedimiento Civil de Puerto Rico, 32 LPRA Ap. V, para limitar la competencia del Tribunal Supremo al momento de expedir recursos de certificación intrajurisdiccional. A esos efectos, arguyen que en casos pendientes ante el Tribunal de Primera Instancia, el Tribunal Supremo sólo podrá traer los mismos ante sí cuando exista la anuencia de todas las partes y concurra un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho, o se presenten cuestiones de alto interés público.
El 28 de mayo de 2013 los empleados públicos presentaron una moción en oposición a la desestimación solicitada por el Gobierno. En ésta los peticionarios arguyen que el trámite para la aprobación y firma de la Ley Núm. 18-2013 estuvo viciado de incertidumbre respecto a la fecha real en la cual fue firmada por el Gobernador de Puerto Rico. Resaltan que el 15 de mayo de 2013, los presidentes del Senado y de la Cámara de Representantes de Puerto Rico enviaron al Gobernador el proyecto que originó la referida Ley, el P. del S. 367, para su evaluación y firma. Coetáneo a lo anterior, sostienen que la Asamblea Legislativa también envió para la firma del Gobernador otro proyecto legislativo, el P. de la C. 940, cuyo trámite legislativo, mas no su contenido, es pertinente al caso de marras.
Los peticionarios, descansando en la información pro-vista por la Oficina de Servicios Legislativos (OSL), alegan *649 que el P. de la C. 940 fue firmado y convertido en la Ley Núm. 18-2013 el 16 de mayo de 2013 y publicada por el Departamento de Estado al día siguiente. Véase Caso Núm. CT-2013-005, Exhibit 2, Oposición a Moción de Certificación. Por otra parte, los empleados públicos sostienen que, por razones desconocidas, el P. del S. 367 también fue firmado y convertido en la Ley Núm. 18-2013, creando así la anomalía de dos proyectos legislativos catalogados con el mismo número de ley. Id. Sin embargo, resaltan que el P. del S. 367, una vez fue convertido en ley, fue publicada por el Departamento de Estado el 20 de mayo del año en curso, tres días luego de firmarse el P. de la C. 940.
Los empleados públicos añaden que, posteriormente, el P. del S. 367 mantuvo su numeración como la Ley Núm. 18-2013, mas el P. de la C. 940 fue renumerado como la Ley Núm. 19-2013. Ello, a pesar de que el P. de la C. 940 fue publicado por el Departamento de Estado con anterioridad a la Ley correspondiente al P. del S. 367. Los peticionarios unen lo anterior a su contención de que el 16 de mayo de 2013 —fecha en la cual los empleados públicos presentaron su petición de certificación ante nos— el P. del S. 367 no aparecía publicado como ley en los registros de la O.S.L. (Caso Núm. CT-2013-005, Exhibit 1, Oposición a Moción de Certificación); sin embargo, el P. de la C. 940 (hoy la Ley Núm. 19-2013) ya había sido aprobado como la Ley Núm. 18-2013.
A la luz de todo lo anterior, sugieren que la Ley Núm. 18-2013 (el P. del S. 367) no fue promulgada el 15 de mayo del año en curso, según lo arguye el Estado. Más bien, intiman que ésta fue aprobada posterior a que los peticionarios sometieran su recurso de certificación.
El 29 de mayo de 2013, el Estado presentó mociones en contestación a las alegaciones de los peticionarios. En sus mociones arguyen que la Ley Núm. 18-2013 fue firmada por el Gobernador el 15 de mayo de 2013, un día antes de la presentación del recurso de certificación de los empleados públicos. Sustentan lo anterior en una copia de la Ley Núm. 18-2013 firmada por el Gobernador el 15 de mayo, al *650 igual que una copia de la página de trámite legislativo de la Cámara de Representantes de Puerto Rico, la cual presenta la misma información contenida en la copia indicada.
Posteriormente, este Tribunal consolidó el recurso de los peticionarios con dos recursos de certificación que consideran el mismo asunto. En concreto, la primera de estas dos peticiones fue presentada el 31 de mayo de 2013, por 390 empleados de la Oficina de Administración de Tribunales (OAT), 68 empleados de la Corporación del Fondo del Seguro del Estado (CFSE) y 88 empleados de múltiples agencias de la Rama Ejecutiva. Asimismo, el 5 de junio de 2013, un grupo de policías presentó un tercer recurso de certificación.
En términos generales, y al igual que el recurso de certificación presentado por los empleados de la Oficina del Contralor de Puerto Rico, estos nuevos peticionarios arguyen que la Ley Núm. 3-2013 es inconstitucional por violentar sus derechos adquiridos al amparo de la See. 7 del Art. II de la Constitución de Puerto Rico, supra.(2) Igualmente, los nuevos peticionarios solicitan que esta Curia adjudique sus reclamos de forma expedita, ya que alegan estar expuestos a sufrir daños patrimoniales inminentes e irreparables.
Al igual que en el caso de los empleados de la Oficina del Contralor de Puerto Rico, el Estado se ha opuesto a estos nuevos recursos. Una vez más, arguye que este Foro carece de jurisdicción para atenderlos, por virtud de la Ley Núm. 18-2013.
Teniendo presente el marco fáctico indicado, analicemos qué dispone la Constitución respecto a la competencia de este Tribunal y su función como Tribunal de última instancia. Como veremos, aunque la Ley Núm. 18-2013 afectó nuestra competencia legislativa al amparo de la Ley de la Judicatura y las Reglas de Procedimiento Civil, en nada puede afectar nuestra competencia constitucional de *651 última instancia, la cual puede ser ejercida en casos de interés público como los de autos y traerlos de inmediato ante nuestra consideración, por exigir un trámite expedito para la concesión de un remedio oportuno.
II
El Art. V, Sec. 2 de la Constitución de Puerto Rico,(3) delega en la Asamblea Legislativa el poder para crear y suprimir tribunales, con excepción del Tribunal Supremo. Const. PR, LPRA, Tomo 1, ed. 2008, pág. 412. A su vez, esta sección confiere a la Asamblea Legislativa la facultad para determinar la competencia y organización del Tribunal General de Justicia.
El ejercicio de este poder, por parte de la Asamblea Legislativa, queda sujeto a dos condiciones de umbral. En primer lugar, esa Rama no puede afectar la jurisdicción de los tribunales; sólo puede incidir sobre su competencia y organización. En segundo plano, la Rama Legislativa no puede emitir ley alguna que contravenga el Art. V, Sec. 3 de la Constitución, el cual provee que el Tribunal Supremo de Puerto Rico es el Tribunal “de última instancia en Puerto Rico”. (Énfasis suplido). Art. V, Sec. 3, Const. PR, LPRA, Tomo 1, ed. 2008, pág. 412. Véanse, también: Col. de Abogados v. E.L.A., 181 DPR 135, 167 (2011) (Sentencia); Petrovich v. Srio. de Hacienda, 79 DPR 250, 260 (1956).
Respecto a esta primera limitación, es preciso distinguir el término jurisdicción del término competencia. Es conocido que el término jurisdicción significa “el poder o autoridad de un tribunal para considerar y decidir casos o controversias”. Rodríguez v. Registrador, 75 DPR 712, 716 (1953). La Constitución de Puerto Rico estableció que “[l]os tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción [...]”. Art. V, Sec. *652 2, supra. Ello implica que en Puerto Rico, “cualquier parte del Sistema Judicial tiene la facultad para resolver una causa”. (Enfasis suplido). Vives Vázquez v. E.L.A., 142 DPR 117, 135 (1996). Véase, también, J. Trías Monge, El sistema judicial de Puerto Rico, San Juan, Ed. UPR, 1978, Sec. 6, Cap. XII, pág. 136.
Ahora bien, lo anterior es diferente al concepto competencia. El término competencia implica la distribución del “trabajo judicial entre los distintos tribunales y salas que integran el Tribunal General de Justicia”. Cosme v. Hogar Crea, 159 DPR 1, 7 (2003). En el caso particular del Tribunal Supremo, la Constitución le otorga competencia en primera instancia sobre autos de hábeas corpus y le reserva una competencia en última instancia sobre toda controversia judicial. Asimismo, la Ley de la Judicatura y las Reglas de Procedimiento Civil, entre otras leyes especiales, le confieren al Tribunal Supremo competencia sobre ciertos recursos y casos en nuestro ordenamiento legal.
Todo lo anterior apunta a que, aunque ciertamente la Asamblea Legislativa puede afectar la competencia legislativamente conferida a los distintos componentes del Tribunal General de Justicia, incluyendo aquella competencia otorgada a esta Curia por virtud de la Ley de la Judicatura y las Reglas de Procedimiento Civil, ésta no tiene poder constitucional para limitar la jurisdicción del Tribunal General de Justicia, ni para afectar la competencia en última instancia constitucionalmente reconocida al Tribunal Supremo de Puerto Rico.(4) Cosme v. Hogar Crea, supra, pág. 18.
*653 Concretamente, cuando se trata del Tribunal Supremo, el Art. V, Sec. 3 de la Constitución de Puerto Rico, supra, limita esa facultad de la Rama Legislativa. Ello, pues, la Constitución expresamente dispone que el Tribunal Supremo es el Tribunal de última instancia en Puerto Rico. Consecuentemente, el Tribunal Supremo siempre tendrá la discreción de ejercer oportunamente su competencia final sobre cada caso que se presente en los Tribunales de Puerto Rico.
El delegado a la Asamblea Constituyente, tratadista de derecho constitucional puertorriqueño y ex juez presidente de este Tribunal, el señor Trías Monge, explicó las consecuencias prácticas de la interacción entre el poder de la Asamblea Legislativa al amparo de la citada See. 2 del Art. V de la Constitución, vis a vis los poderes del Tribunal Supremo al amparo de la See. 3 del mismo articulado en las palabras siguientes:
La intención de la Comisión al disponer en la sección 2 del artículo V que la Asamblea Legislativa podría determinar la competencia de los tribunales del país en modo alguno conllev[a] la facultad de privar al Tribunal Supremo de entender, a su entera discreción, en cualquier causa que le fuese presentada, se opusiese o no la parte demandada o fuese el asunto concernido de la supuesta competencia del Tribunal Supremo conforme a los estatutos vigentes. (Enfasis suplido). J. Trías Monge, Historia constitucional de Puerto Rico, San Juan, Ed. Universidad de Puerto Rico, 1982, Vol. III, pág. 95. Véase, también, J. Trías Monge, El sistema judicial de Puerto Rico, op. cit., Cap. XI, See. 6, pág. 122.
Los padres de la Constitución de Puerto Rico fueron ex-plícitos en confirmar lo anterior, al expresarse en los términos siguientes:
Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia.
*654 Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. Y quiere decir además, al estipular esta proposición que nosotros he-mos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. (Énfasis suplido). 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 591-592 (1952), 25to Día de Sesión (Expresiones del delegado Sr. Gutiérrez Éranqui).
Las expresiones así vertidas en la Asamblea Constituyente perfilan los rasgos fundamentales de aquello que constituye ser un tribunal de última instancia. En primer lugar, “[e]ste lenguaje nos provee de inmediato la característica esencial de foro máximo de [competencia] apelativa, en contraste con los otros tribunales [...] de [competencia] original. A su vez destaca la nota singular del linaje constitucional del Tribunal Supremo frente a los otros que son producto de la Asamblea Legislativa”. In re Informe Com. Asesora Presidente, 119 DPR 165, 194 (1987), voto explicativo del Juez Asociado Señor Negrón García. En segundo plano, estas manifestaciones articulan “los dos fines básicos de un tribunal de última instancia: hacer justicia individual y sentar las normas jurídicas básicas que han de gobernar la vida de un país”. Id., pág. 197.(5)
Es en virtud de esta segunda consideración -el hacer justicia individualque nuestra función “como Tribunal de última instancia, [nos impone] la responsabilidad constitucional de asegurarnos que [los principios de jurisdicción y competencia] produzca[n] los resultados esperados de suerte que facilitemos la administración justa, rápida y económica de las causas que se presentan ante nuestros tribunales de justicia”. (Enfasis suplido). Vives Vázquez v. *655 E.L.A, supra. Como corolario de esta responsabilidad constitucional, somos llamados a intervenir oportunamente en el tracto judicial, cuando la protección de derechos constitucionales así lo requiera y cuando resulte imperativo para lograr la protección adecuada del remedio que, en su día, le corresponda a las partes. Véase Pueblo v. Montero Luciano, 169 DPR 360, 389 (2006) (“[NJuestra función como tribunal de última instancia requiere que velemos que en nuestro País exista un sistema de justicia donde se respeten [Zos] derechos fundamentales” de los individuos). (Enfasis suplido).
Lo anterior responde a que “la ciudadanía [confía] en este Foro como último recurso para vindicar [sus] derecho [s] y proveer [le] objetivamente [...] un remedio justo y equitativo [...]”. Mundo Ríos v. CEE et al., 187 DPR 200, 216 (2012), opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez. Es por ello que en el pasado, ante el peligro de que la lentitud de los procesos judiciales inferiores amenazara nuestra facultad para otorgar un remedio oportuno en un caso de gran interés público, fuimos prestos en ejercer nuestra prerrogativa constitucional como Tribunal de última instancia para traer ante nuestra consideración un caso pendiente ante el Tribunal de Primera Instancia. Mundo Ríos v. CEE et al., supra, pág. 205 (opinión per curiam). Esto con el fin de proteger derechos constitucionales de alta jerarquía.
En iguales términos, el Reglamento de esta Curia también vislumbra la posibilidad de que traigamos ante nuestra consideración un caso para su inmediata resolución, independientemente de la etapa en que se encuentre el pleito, incluyendo aquellas fases del proceso previas al descubrimiento o al desfile de prueba. Es por ello que los miembros de este Tribunal adoptaron la Regla 51 de nuestro Reglamento, la cual dispone lo siguiente:
(a) El tribunal podrá, a iniciativa propia o a solicitud de parte, ordenar una vista evidenciaría para celebrarse ante sí o ante un Comisionado o una Comisionada Especial. Salvo que el tribunal otra cosa disponga y en tanto ello no sea incompa *656 tibie con estas reglas, las Reglas de Procedimiento Civil y de Evidencia aplicarán a toda vista de esta índole y el Secretario o la Secretaria expedirá las citaciones y otros mandamientos que requiera el Comisionado o la Comisionada Especial como si se tratara de una orden del tribunal.
(b) El Comisionado o la Comisionada Especial resolverá los planteamientos sobre admisibilidad conforme a derecho. Terminada la presentación de la prueba, el Comisionado o la Comisionada rendirá un informe con determinaciones de hechos fundadas exclusivamente en la prueba presentada y admitida. El informe deberá presentarse al tribunal, con copia a las partes, dentro de los treinta (30) días de terminada la presentación de la prueba. De ser necesario, el tribunal podrá requerir el informe en un plazo más corto. Junto con el informe se remitirá toda la prueba documental y material que haya sido presentada. Aquella prueba presentada y que no haya sido admitida se identificará claramente como tal y se indicará, además, la razón por la que no fue admitida.
(c) Las partes tendrán un término simultáneo de veinte (20) días, contados desde la notificación del informe, para ofrecer sus comentarios u objeciones. Transcurrido dicho término, el tribunal resolverá lo que en derecho proceda.
(d) Se hará una grabación de sonido de cualquier vista que se celebre ante el propio tribunal o ante un Comisionado o Comisionada. El operador u operadora de la grabadora certificará la corrección de cualquier transcripción hecha. La transcripción sólo se hará en los casos siguientes: (1) cuando el tribunal o el Comisionado o la Comisionada así lo ordenen por considerar la transcripción indispensable para formular sus determinaciones de hechos, o (2) cuando cualquiera de las partes objete las determinaciones de hechos del Comisionado o Comisionada, y el tribunal considere indispensable la transcripción para resolver las objeciones. De no ser posible la grabación, se tomarán notas taquigráficas de la vista, las cuales sólo se transcribirán conforme a las normas antes señaladas. No obstante lo anterior, si por cualquier razón la transcripción de la evidencia oral se tarda indebidamente, el tribunal podrá requerirle al Comisionado o Comisionada que proceda a formular sus determinaciones de hechos sin la transcripción.
(e) Esta regla no aplica a los procedimientos dispuestos en las Reglas 14 y 15 de este reglamento, los cuales se regirán por lo establecido allí. (Enfasis suplido). 4 LPRAAp. XXI-B.
Del texto citado se deducen varios principios referentes a la capacidad de este Tribunal para recopilar cualquier tipo de prueba conducente a la pronta adjudicación de un caso de gran interés público. En primer lugar, este Tribu *657 nal está investido con la autoridad de celebrar una vista evidenciaría y recibir prueba de forma directa, o a través de un comisionado especial, para así arribar a sus propias determinaciones de hechos. En segundo plano, este mecanismo dispone para que la recopilación de prueba se realice en plazos cortos, de forma tal que el Tribunal pueda resolver conforme a derecho de manera expedita. Finalmente, esta Regla es aplicable a procedimientos distintos a aquellos iniciados al amparo de nuestra facultad para regular la profesión de la abogacía y la notaría (Reglas 14 y 15 de nuestro Reglamento, 4 LPRA Ap. XXI-B). Incluso, los comentarios provistos por esta Curia en el propio Reglamento disponen que este mecanismo traspasa su uso en instancias surgidas al amparo de la Regla 28 de nuestro Reglamento (mociones en auxilio de nuestra jurisdicción), pudiendo emplearse “en cualquier caso que el Tribunal lo estime conveniente”. (Énfasis suplido). íd., Regla 51 esc. 28.
De tal manera queda evidenciado que este Tribunal, como foro de última instancia, cuenta con la autoridad legal y los mecanismos necesarios para poder intervenir en un pleito pendiente ante la consideración de un tribunal inferior, no importa su etapa, con el fin de disponer del mismo de forma final y firme, en aras de impartir justicia oportuna.
Y es que así debe ser, ya que esta responsabilidad constitucional de impartir justicia mediante nuestra consideración oportuna de los casos de interés público pendientes ante el Tribunal General de Justicia es un corolario forzoso de la cláusula del debido proceso de ley, por ser un principio de justicia muy arraigado en la conciencia del pueblo' puertorriqueño el que este Tribunal emita decisiones finales y firmes que salvaguarden los remedios justos y adecuados de la ciudadanía cuando el trámite judicial ordinario amenaza tal legítima expectativa. Declinar ejercer este encargo de rango constitucional implica negarle el derecho al pueblo de Puerto Rico de acudir a este Tribunal de última instancia, cuando aún exista una controversia viva *658 que atender respecto a la viabilidad de los remedios que solicita.
A su vez, nuestra intervención en casos como estos es exigida por la política pública de esta rama de fomentar el acceso a la justicia. Ello, en función de que “ ‘[l]os estatutos que regulan la jurisdicción o la facultad de los tribunales de atender y resolver las controversias ante sí de la ciudadanía, son de alto interés público’, y [...] dicho interés urge el mayor acceso posible de los ciudadanos a sus tribunales de justicia”. (Escolio omitido y énfasis suplido). H.A. Sánchez Martínez, Práctica jurídica de Puerto Rico: derecho procesal apelativo, Hato Rey, Ed. Lexis-Nexis de Puerto Rico, 2001, See. 102, pág. 4.
Habiendo repasado estas consideraciones de rango constitucional, pasemos a articular las razones por las cuales erró una mayoría de este Tribunal al no expedir los recursos de epígrafe.
III
En sus mociones de desestimación, el Estado arguye que este Tribunal no posee jurisdicción para entender en las peticiones de certificación de los empleados públicos, por virtud de la Ley Núm. 18-2013, la cual enmendó el Art. 3.002 de la Ley de la Judicatura, supra, y la Regla 52.2 de Procedimiento Civil, supra, a los fines de impedir nuestra intervención en aquellos casos de gran interés público pendientes ante el Tribunal de Primera Instancia, en los cuales no exista la anuencia de todas las partes para presentar la certificación indicada. No le asiste la razón.
Como cuestión de umbral, las mociones de desestimación del Estado invocan la Regla 32 del Reglamento de esta Curia para sostener que los recursos que nos ocupan deben ser desestimados, ya que “este tribunal carece de jurisdicción para considerarlo[s]”. 4 LPRA Ap. XXI-B, R. 32(b)(1). Al así proceder, las mociones del Estado obvian la diferencia existente entre el concepto jurisdicción y el término competencia.
*659 Como bien indicamos anteriormente, el término jurisdicción implica la autoridad de un tribunal para considerar y decidir determinado caso o controversia. Debido a que los tribunales de Puerto Rico, incluyendo esta Curia, constituyen parte de un sistema judicial unificado en lo concerniente a jurisdicción, el Estado pasa por alto que este Tribunal posee amplia facultad, al igual que cualquier otro tribunal de nuestro sistema general de justicia, para entender y resolver la materia legal que atañe a los casos de autos. A la luz de esta conclusión, no cabe hablar de la aplicabilidad de nuestra Regla 32(b)(1), supra, a los recursos de certificación en disputa. Ello, pues, la jurisdicción de este Tribunal en este asunto es más que evidente.
En todo caso, interpretamos que el Estado pretendió argüir que por virtud de la Ley Núm. 18-2013, este Tribunal carece de competencia al amparo de la Ley de la Judicatura y la Regla 52.2 de Procedimiento Civil, supra, para considerar las peticiones de certificación de los empleados públicos. No obstante, esta alegada insuficiencia de competencia a la luz de la Ley Núm. 18-2013, laceraría la competencia en última instancia que nuestra Constitución nos reserva sobre toda controversia judicial. Distinto a los tribunales de inferior jerarquía, cuya existencia y competencia puede ser alterada cuando el designio del Poder Legislativo así lo pretenda, la existencia y la competencia constitucional de esta Curia como Tribunal de última instancia sobrevive inmóvil ante los embates de las otras Ra-mas, cuyas expectativas de política pública depositadas al filo de la medianoche en la Ley Núm. 18-2013, no sobreviven el escrutinio de las facultades que nos reserva la Constitución y sobrepasan ilegítimamente las fronteras de sus poderes delegados.
Como bien discutimos anteriormente, al reseñar algunos de nuestros pronunciamientos jurisprudenciales, esta facultad constitucional de constituir el Tribunal de última instancia en nuestro sistema general de justicia, nos impone la responsabilidad indeleble de hacer justicia individual. En esa faena revestida de rango constitucional, *660 hemos sido precisos en establecer que tenemos el deber de administrar las causas que se presentan ante los tribunales inferiores, de tal forma que se respeten los derechos constitucionales de las partes, se facilite la resolución justa de los casos y se garantice la concesión de un remedio justo y adecuado.
Ante ello, cuando el trámite judicial ordinario amenaza con perjudicar la facultad de este Tribunal para entender en un caso de gran interés público, hemos resuelto sin ambages que, con el fin de otorgar un remedio justo y equitativo en el ejercicio y en la defensa de nuestra competencia constitucional en última instancia, se justifica nuestra intervención oportuna para garantizar que las dilaciones inherentes al cauce judicial ordinario no aniquilen el desagravio que en su día este Tribunal pudiera otorgar. Véase Mundo Ríos v. CEE et al., supra.
Esta prerrogativa constitucional exigía que esta Curia atendiera inmediatamente los recursos ante nos, para darle vigor a la política de acceso a la justicia de esta Rama. Ello, pues, si nuestro sistema de tribunales no resuelve sus reclamos oportunamente y dispone de forma pronta el Derecho aplicable a las controversias aquí presentadas, los peticionarios y el Estado sufrirán un grave menoscabo a sus intereses.
En primer lugar, los empleados públicos que tocan a nuestras puertas se enfrentan al cruel dilema de tener que decidir, antes del 1 de julio del año en curso, entre dos alternativas de planificación financiera, cuyas repercusiones lesionarán potenciales derechos constitucionales. Por un lado, los peticionarios enfrentan la difícil opción de tener que renunciar a sus empleos en aras de mitigar las embestidas de la Ley Núm. 3-2013, la cual amenaza con privarles de los beneficios y las aportaciones patrimoniales al fondo de retiro que les fueron prometidas cuando firmaron su contrato para fungir como servidores públicos. Ello, con la consecuencia desdichada de no poder contar con el 100 por ciento de su remuneración salarial actual, por te *661 ner que renunciar a sus empleos, a fin de preservar algunos de los beneficios de retiro que les fueron acordados. Aquellos que no opten por esta primera alternativa, deben continuar en sus funciones hasta pasada la edad original de retiro que les fue garantizada en la Ley Núm. 447 antes de ser enmendada, sacrificando, además, el disfrute de un porcentaje significativo de ingresos que ordinariamente hubiesen recibido al momento de su retiro si la Ley Núm. 3-2013 no hubiese sido promulgada. Ello, con el propósito de continuar recibiendo el 100 por ciento de su salario.
En consecuencia, si este Tribunal no emite una expresión final y firme respecto a la validez constitucional de la Ley Núm. 3-2013 antes del 1 de julio del año en curso, los servidores públicos se verán obligados a tomar una decisión sin que su reclamo fuera atendido con la finalidad necesaria y, de esta manera, actuarán en un vacío jurídico. Este problema se acentúa aún más cuando tomamos en consideración que determinadas provisiones de la Ley Núm. 3-2013 ya han entrado en vigor. En particular, la ley indicada provee para que el Art. 4-109 de la Ley Núm. 447, según fue creado por la Ley Núm. 3-2013, entre en vigor inmediatamente. Véase See. 42 de la Ley Núm. 3-2013. Este articulado obliga a los empleados públicos interesados en preservar sus beneficios de retiro, según éstos estaban configurados antes de promulgarse la Ley Núm. 3-2013, a que presenten ante la Administración de Sistemas de Re-tiro una solicitud a esos efectos antes del 30 de junio de 2013, fecha en la cual entrarán en vigor las restantes provisiones de la ley impugnada. Véase Sec. 30 de la Ley Núm. 3-2013. De tal manera, la propia ley acelera la decisión de los empleados, acrecentando así la necesidad de que este Foro intervenga oportunamente y se exprese con inmediatez y finalidad. Más aún cuando las normas administrativas de la Administración de los Sistemas de Retiro imponen a los empleados públicos unas condiciones más *662 lesivas al calendario provisto en el propio estatuto, lo cual nos requería emitir un remedio interdictal.(6)
Por otra parte, el Estado también enfrentará el peligro inherente a la incertidumbre de no conocer oportunamente si su política pública de cara a la crisis del sistema de re-tiro, sobrevivirá nuestra facultad constitucional de revisión judicial. Resulta sorprendente como el propio Estado pueda consentir a la situación de incertidumbre actual, frente a las exigencias de las casas acreditadoras que evalúan nuestra salud crediticia, poniendo en jaque la estabilidad del fisco y propiciando una serie de consecuencias colaterales nefastas que incidirán sobre las múltiples esferas de la economía puertorriqueña.
Ante tales peligros, opino que la Ley Núm. 18-2013 no constituía un escollo para que expidiéramos los recursos de los peticionarios y, en el ejercicio de nuestra competencia como Tribunal de última instancia, trajéramos ante nosotros los casos pendientes ante el foro primario para atenderlos debidamente y dar fin a la incertidumbre que estas controversias presentan. Ello con el propósito de administrar estos casos de forma justa, rápida y económica, evitando que el trámite judicial ordinario privara a los empleados públicos y al Estado de un dictamen judicial que les otorgara el remedio justo de poder decidir, de manera informada, cuál de las alternativas indicadas debían seleccionar.
No obstante, la decisión de una mayoría de este Tribunal omite considerar oportunamente estas controversias de *663 gran interés público y claudica a su facultad constitucional de garantizar un remedio justo, adecuado y oportuno. En su lugar, este Foro opta por instruir al Tribunal de Primera Instancia a que se asegure “que las partes demandantespeticionarias tengan a su disposición cualquier remedio provisional de naturaleza interdictal o de cualquier otra índole que sea necesario para preservar sus derechos frente a la fecha límite que se avecina”. (Enfasis suplido). Resolución CT-2013-0005, pág. 34. Al así obrar, este Tribunal evita ejercer la plena facultad de sus poderes constitucionales.
Concretamente, este Foro opta por relevarse a sí mismo de la competencia que la Ley Suprema le impone como Tribunal de última instancia para interpretar todo estatuto, a la luz del significado de la Constitución; prefiriendo, en su lugar, colocar su encargo constitucional sobre los hombros de un tribunal de inferior jerarquía, para que éste, “[c]omo mínimo, [resuelva este] asunto antes de que entre en vigor la Ley Núm. 3, supra, el 1 de julio de 2013”. (Enfasis suprimido). Resolución, supra, pág. 34. Ello, pues, la mayoría interpreta que es el “deber [del foro primario] evitar que la demora judicial deje sin remedio a una parte que lo amerit[a]”.(7) íd.
No obstante, tal conclusión ignora que el principal encargado de evitar tales males es, precisamente, este Tribunal. Es por eso que me opongo a que los pleitos de marras continúen su curso ordinario, sin garantía alguna de que los mismos sean resueltos de forma final y firme por este Tribunal antes del 1 de julio de 2013. Sostengo mi contención en el entendimiento de que, según el esquema *664 de la Ley Núm. 3-2013, el mes de junio resulta ser uno crucial para los intereses de los peticionarios. En otras palabras, la decisión de este Tribunal “implosiona el camino para que [los demandantes] puedan lograr remedios importantes y urgentes”, de cara a sus “daños concretos y detallados, que parecen ser suficientes de su faz”. Resolución, supra, pág. 22-23 y 32. El remedio considerado en el “no ha lugar” provisto en la Resolución mayoritaria, pasa por alto que posponer nuestra intervención hasta el mes de junio nos privaría de conceder un remedio adecuado, completo y oportuno.
En resumidas cuentas, este Tribunal claudica hoy a ejercer los deberes ministeriales que emanan de nuestra competencia constitucional como tribunal de última instancia, a saber: (1) no le están haciendo justicia individual a los servidores públicos que están tomando una decisión desinformada; (2) no están interviniendo oportunamente para dirimir si procede proteger garantías constitucionales; (3) posponen irrazonablemente nuestra facultad constitucional de pautar las normas jurídicas que gobernarán, no solamente la vida de 614 peticionarios, sino de miles de empleados públicos que se encuentran en la espera de obtener una norma final y firme, y (4) no podrán ofrecerle un remedio completo, adecuado y oportuno, en caso de que sus reclamos prevalezcan.
En su defecto, intentan distinguir esta controversia de otros casos que en el pasado este Tribunal ha certificado, tal como es el caso de la Ley Núm. 7-2009, Domínguez Castro et al. v. E.L.A. I, 178 DPR 1 (2010). Fundamentan su distinción en su entendimiento de que en aquel caso la controversia medular era la constitucionalidad de la ley. ¿Acaso no es esa la controversia medular que requería un ejercicio inmediato de nuestra competencia constitucional en el caso de autos? Precisamente, sin resolver esa interrogante no podemos evaluar si procede ordenarle a la Rama Ejecutiva que cese y desista de hacer cumplir la ley impugnada por los servidores públicos. Por eso es que era necesario que esta Curia decretara prontamente la constitucionalidad o incons *665 titucionalidad de la Ley Núm. 3-2013. En caso contrario, el mes de julio resultará muy tarde y será imposible conceder un remedio adecuado, completo y oportuno, en caso de que la parte peticionaria prevalezca en los méritos.
Lamentablemente, la mayoría no recorrió la totalidad del trayecto al limitarse a atender el alcance de la Ley Núm. 18-2013 y obvió el tramo de atender la constitucionalidad o inconstitucional de la Ley Núm. 3-2013, el cual conducía a la meta del reclamo de los empleados públicos peticionarios en el momento oportuno. Teníamos en nuestras manos la oportunidad de atender con premura una controversia de alto interés público, la cual incide sobre el bienestar patrimonial de miles de empleados públicos, sus familiares inmediatos y el pueblo de Puerto Rico, en aras de traer certeza respecto a la constitucionalidad o inconstitucionalidad de la Ley Núm. 3-2013, para que éstos pudiesen tener un remedio adecuado que les permitiese planificar su futuro financiero. Sin embargo, una mayoría de este Tribunal optó por no recorrer el camino completo, ante tan crucial coyuntura para la vindicación de derechos constitucionales de la más alta jerarquía y la dispensación oportuna de justicia.
Tal proceder ignora que la Ley Núm. 18-2013, aunque afectó nuestra competencia al amparo de la Ley de la Judicatura y las Reglas de Procedimiento Civil, en nada afectó nuestra competencia constitucional de última instancia, la cual puede ser ejercida en casos de interés público como los de autos, para traer de inmediato un caso ante nuestra consideración, en el cual la concesión de un remedio oportuno exige un trámite judicial expedito. Ante tal lamentable realidad, no me queda otra alternativa que disentir.
IV
Por los fundamentos antes expuestos, hubiese declarado no ha lugar a las mociones de desestimación presentadas *666 por el Estado y traería de inmediato a nuestra atención los recursos que nos ocupan.

 Desconocemos por qué la Asamblea Legislativa utilizó la frase “ambas partes”, ya que en muchos casos presentados en los tribunales de Puerto Rico existen más de dos partes.

 http://www.noticel.com/noticia/141824/agp-tiene-en-mente-el-banquetetotal-de-pnp-con-el-supremo.html (última visita el 4 de junio de 2013).

 El informe se puede ver en el enlace siguiente: http://www.ramajudicial.pr/ sistema/supremo/estadisticas/INFORME-ESTADISTICO-TRIBUNAL-SUPREMOA-FISCAL-2011-2012.pdf.

 http://www.wapa.tv/noticias/locales/juez-presidente-del-supremo-guardasilencio_20130520163511.html (última visita el 4 de junio de 2013).

 Diario de Sesiones de la Convención Constituyente de Puerto Rico 589 (1952).

 Véase L.J. Torres Asencio, Un nuevo golpe a la administración de la Justicia, disponible en: http://derechoalderecho.org/2013/05/25/un-nuevo-golpe-a-laadministracion-de-la-justicia/.

 Ponencia del Hon. Juez Presidente Federico Hernández Denton, La separación de poderes y la interpretación constitucional en Puerto Rico, XIII Encuentro de Presidentes y Magistrados de los Tribunales Constitucionales y de las Salas Constitucionales de América Latina, México, 2006. Disponible en: http://www.scribd.com/ doc/51523764/La-Separacion-de-Poderes-y-la-Interpretaeion-Constitucional-enPuerto-Rico-2006 (última visita 11 de junio de 2013).

 Art. V, See. 2, Const. PR, LPRA, Tomo 1.

 Véase Cosme v. Hogar Crea, 159 DPR 1, 18 (2003).

 J. Andréu García, La independencia judicial ante la propuesta enmienda a la Constitución del Estado Libre Asociado de Puerto Rico, Mensaje ante la Asociación Nacional de Estudiantes de Derecho, el 25 de agosto de 1994 (29 Rev. Jur. UIPR 23, 27 (septiembre-diciembre 1994)).

 Mensaje del ex Juez Presidente Señor Andréu García, Autonomía presupuestaria para la Rama Judicial, 20 de diciembre de 2002. Citando ponencia ante la Asamblea Legislativa de 11 de abril de 2002. Disponible en: http://www.ramajudicial. pr/orientacion/prensa/20-12-02.html (última visita 10 de junio de 2013).

 Exposición de Motivos de la Ley Núm. 18-2013.

 Charles de Montesquieu, filósofo y jurista francés.

 Ceremonia Jur. Juez Rivera García, 179 DPR ix, xviii (2010).

 Secretariado de la Conferencia Judicial, La independencia judicial en Puerto Rico, 1988, pág. 13.

 Mensaje del ex Juez Presidente Señor Andreu García, Autonomía presupuestaria para la Rama Judicial, supra.

 íd.

 íd.

 Opinión disidente Juez Asociada Señora Rodríguez Rodríguez, In re Aprob. Rs. y Com. Esp. Ind., 184 DPR 575, 677 (2012).

 Opinión disidente Juez Asociada Señora Rodríguez Rodríguez, In re Solicitud Aumentar Núm. Jueces TS, 180 DPR 54, 119 (2010).

 íd.

 J. Castán Tobeñas, Poder Judicial e Independencia Judicial, Ed. Reus, Madrid, 1951, pág. 41.

 In re Solicitud Aumentar Núm. Jueces TS, supra.

 Joaquín Setantí, escritor catalán, autor de Centellas de varios conceptos (1614).

 Amerita resaltar que desde el 16 de mayo de 2013, esta Curia ha tenido ante sí la controversia que nos atañe. Sin embargo, ha tomado casi un mes emitir la decisión que hoy se certifica. Este problema se recrudece aún más cuando consideramos que, por virtud de la Regla 23(b)(2) de nuestro Reglamento, el Tribunal de Primera Instancia se ha visto impedido de emitir una sentencia que disponga de esta controversia, hasta tanto esta Curia deniegue la expedición del auto de certificación presentado. 4 LPRA Ap. XXI-B.

 A la luz de la afinidad existente entre los recursos incoados, catalogaremos colectivamente a los peticionarios de los tres autos de certificación como “peticionarios” o “empleados públicos”.

 “La Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, conexcepción del Tribunal Supremo, y determinará su competencia y organización”. (Enfasis suplido). Const. PR, LPRA, Tomo 1, ed. 2008, pág. 412.

 Amerita resaltar que la See. 2 del Art. V de la Constitución de Puerto Rico, supra, la cual instaura la facultad de la Asamblea Legislativa para afectar la competencia y organización de los tribunales de justicia, encuentra su precedente directo en el Art. VI de la Constitución de 1947 del estado de New Jersey. Véase Informe de la Comisión de la Rama Judicial, 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2609-2610 (Í952). Al examinar el Art. VI de la Constitución de New Jersey de 1947, encontramos que ésta limitaba la facultad de la Asamblea Legislativa para alterar la competencia de los tribunales, sólo a aquellos de inferior jerarquía. El texto era explícito y claro en salvaguardar a la Corte Suprema del Estado de New Jersey de tal intromisión. (“The judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction. The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law”). Art. VI, Sec. 1, Const. NJ, 1947.

 Es por ello que, en consecución de estos fines, nuestros dictámenes resultan en la expresión final, suprema y obligatoria de la interpretación de las leyes. Col. de Abogados v. E.L.A, 181 DPR 135, 196 (2011); Andino Torres, Ex parte, 152 DPR 509, 519 (2000), voto de inhibición del Juez Asociado Señor Rivera Pérez; Misión Ind. P.R. v. J.P., 146 DPR 64, 198 (1998), opinión de conformidad en parte, disidente en parte y concurrente en parte del entonces Juez Asociado Señor Hernández Denton.

 En el caso CT-2013-0006, los peticionarios presentaron una moción en auxilio de nuestra jurisdicción, al amparo de la Regla 28 de nuestro Reglamento, 4 LPRA Ap. XXI-B. En su escrito, los empleados públicos presentaron comunicaciones administrativas de la Corporación del Fondo del Seguro del Estado y de la Administración de Compensaciones por Accidentes de Automóvil, las cuales instaban a aquellos empleados interesados en renunciar a sus empleos para garantizar la preservación de sus beneficios de retiro, a hacerlo antes del 31 de mayo de 2013. Esta fecha es más aun onerosa que aquella provista por la propia Ley Núm. 3-2013, la cual dispone para tales peticiones hasta el 30 de junio del año en curso. Véase Sec. 30 de la Ley Núm. 3-2013. Ante esta realidad, urgía que proveyéramos ha lugar a la moción en auxilio de jurisdicción de los peticionarios, con el fin de emitir una decisión final y firme ante los daños inminentes e irreparables que tal directriz administrativa podría generar.

 En iguales términos, la Resolución mayoritaria ordena que el Tribunal de Primera Instancia celebre una vista evidenciaría antes del 17 de junio de 2013. Este mandato presenta varios peligros. En primer lugar, entiendo que el daño de no poder tomar una decisión informada antes del 1 de julio de 2013 es lo suficientemente real y patente como para considerar en sus méritos los planteamientos constitucionales que nos presentan los peticionarios. En segundo plano, nada garantiza que, una vez celebrada la vista, el foro primario posponga su decisión hasta el 1 de julio de 2013, según se lo permite la decisión que hoy emite esta Curia. Tal posibilidad atenta contra la finalidad y certeza que este pleito exige. Un día más sin que se resuelva el caso de autos en sus méritos es undía muy tarde.